NATIONAL LABOR RELATIONS BOARD, Petitioner,

and

**Northern Telecom, Inc., Intervenor,**

v.

**LOCAL 3, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL–CIO, Respondent.**

**No. 530, Docket 83–4159.**

United States Court of Appeals, Second Circuit.

Argued Jan. 23, 1984.

Decided March 15, 1984.

Ralph C. Simpson, Attorney, N.L.R.B., Washington, D.C. (William A. Lubbers, General Counsel, John E. Higgins, Jr., Deputy General Counsel, Robert E. Allen, Acting Associate General Counsel, Elliot Moore, Deputy Associate General Counsel, William Wachter, Attorney, N.L.R.B., Washington, D.C.), for petitioner.

Norman Rothfeld, New York City, for respondent.

Bertrand B. Pogrebin, Mineola, N.Y. (Rains & Pogrebin, P.C., Mineola, N.Y.), for intervenor.

Before MANSFIELD, PIERCE and WINTER, Circuit Judges.

PIERCE, Circuit Judge:

This case comes before this court upon the application of the National Labor Relations Board ("NLRB" or "Board"), pursuant to section 10(e) of the National Labor Relations Act ("NLRA" or "Act"), 29 U.S.C. § 160(e) (1976),[1] for enforcement of its order issued on October 26, 1982, against Local 3, International Brotherhood of Electrical Workers ("Local 3"). For the following reasons, we grant enforcement.

## I. BACKGROUND

Northern Telecom, Inc. ("Telecom") is engaged in the business of selling, installing, and repairing telephone systems. Telecom's installation employees are represented by the Communication Workers of America, AFL–CIO ("CWA"), for the purposes of collective bargaining. Telecom's installation of multi-floor telephone systems generally requires surveying the location, ascertaining the materials necessary, pulling the telephone cables, placing the telephone instruments and building the private automatic branch exchanges, the pieces of equipment that connect the installed telephones to the outside world.

Telecom's installation of multi-floor telephone systems also requires preparatory electrical work, commonly called access work, that generally is performed by electrical contractors under collective bargaining agreements with Local 3, a union that represents electricians in the New York City area. The installation of a multi-floor telephone system usually begins with Telecom pulling station cable. During this same time, the electrical contractor usually commences the preparatory or access work so that when Telecom finishes pulling the station cable, it can enter the electrical closets and "run ... risers to connect all floors together." After the riser shaft work and other electrical contractor work is finished, Telecom pulls larger riser cables from any floor where telephones are located down to the switchroom. Finally, Telecom connects the private automatic branch exchange and tests it.

For a number of years, Local 3 has pursued a "total job" policy, pursuant to which it claims all electrical work, including installation of telephone systems, in projects on which its members do any of the electrical work. This policy is reflected in Art. XIII, Sec. 12 of Local 3's bylaws: "No member is to give away work coming under the jurisdiction of this Local, or to allow any other tradesmen to do work coming under this Local's jurisdiction." Local 3's bylaws further require members to report anyone who violates this rule and provide that violators may be disciplined in proceedings brought before Local 3's executive board.[2]

On or about August 14, 1981, Telecom contracted with Johnson & Higgins ("J & H"), a company engaged in the insurance brokerage business, for the sale and installation of a 1200-telephone communications system in the ten or more floors J & H was to occupy in a building at 95 Wall Street in New York City. The installation work included the pulling of station cable for each telephone to a location on each floor, the joining of each floor together with riser cable running through the building to the switchroom where the private automatic branch exchange was to be located, testing of the telephones, and cutting over to the New York Telephone Company central office lines.

1. Section 10(e) states in pertinent part:
 The Board shall have power to petition any court of appeals of the United States, or if all the courts of appeals to which application may be made are in vacation, any district court of the United States, within any circuit or district, respectively, wherein the unfair labor practice in question occurred or wherein such person resides or transacts business, for the enforcement of such order....
 29 U.S.C. § 160(e) (1976).

2. Article XIII, section 8 of the *Bylaws of Local Union No. 3* provides: "Members shall report to the Business Manager or Business Representative any violation of the working rules or bylaws within 36 hours." Further, Article XIII, section 1 provides: "The Executive Board shall act as the Trial Board to hear charges and try members ... for violation of the I.B.E.W. Constitution, these bylaws, or an approved working agreement."

In conjunction with this installation work, J & H required the performance of access work. This access work consisted of the installation of electrical circuits, the grounding of circuits in the telephone switchroom, the coring of holes in the floors, and the installation of conduit to transport cables from floor to floor. J & H reserved the right to choose an electrical contractor to provide the access work needed for the installation. George H. Kleinknecht, Inc. ("Kleinknecht"), an electrical contractor under contract with Local 3, bid on the access work and was awarded the job. Kleinknecht was already performing other electrical work at the jobsite.

On November 9, before Kleinknecht began the J & H telephone access work, Telecom started working at 95 Wall Street. The next day, Stuart Brown, the Kleinknecht foreman and a member of Local 3, approached several Telecom technicians and asked them if they belonged to a union. Further, he requested that they show their union cards. Two of the technicians produced their cards, which confirmed their CWA membership. At this point, Brown showed his own Local 3 card and asked the group of Telecom employees if they would like to join Local 3. When the employees declined, Brown responded that a Local 3 steward would talk to them in the future.

Kleinknecht began the telephone access work on November 23, 1981, and by December 11 it had completed work on several floors at the jobsite. On that day, Kleinknecht employees stopped their work, which was then in progress on the twelfth floor, and abandoned their equipment—including pipes, tubings, tools, and gang boxes—near the freight elevator. The following Monday, December 14, William Standley, J & H's manager of office services, and the person responsible for coordinating Kleinknecht's access work with Telecom's work, met with Brown to discuss a construction project at another jobsite. At that time, Brown informed Standley that there was a jurisdictional problem between Local 3 and CWA at the J & H jobsite and that the access work had been halted. As a result of this information, Standley then called Peter Kleinknecht, a principal of Kleinknecht, who confirmed that there was a labor jurisdictional problem, that his men were not working, and that Local 3 was claiming that it should do all the work on the telephone system, including the work that Telecom was performing.

The following morning, December 15, Standley met in his office with Brown and Alf Flornes, a Kleinknecht employee who had signed the bid for the Telecom access work. During a conversation about another construction project, Standley asked about the Telecom telephone installation problem. Brown responded that there was a jurisdictional problem between Local 3 and CWA. Following this discussion, Standley took Brown and Flornes downstairs to a weekly status meeting where a discussion about the J & H project was in progress. Present at this meeting were Darwin Ley, Telecom's manager of financial and administrative systems; Brian Reilly, Telecom's project manager; and three other employees. After being introduced by Standley, Brown confirmed that work had stopped because of a jurisdictional dispute between Local 3 and CWA. Further, Brown stated that Local 3's jurisdiction extended to pulling cable on the J & H jobsite based on precedent established at another jobsite. Reilly responded that no precedent was set because the other jobsite had involved another employer's determination as to whom it wanted to do the work. Reilly also asked if Local 3 expected to pull cable at New York Telephone jobsites where CWA members were employed also. Brown responded "no" and explained that an "arrangement" had been made regarding those jobsites. Ley asked if Local 3 felt that it should be doing all of the electrical work at the project and Brown nodded affirmatively.

After leaving the meeting, Standley telephoned Peter Kleinknecht. Peter Kleinknecht informed him that in view of the labor dispute, Kleinknecht was prepared to complete the entire job at no extra cost to J & H. Thereafter, during a conference call between Standley, Peter Kleinknecht and

Ley, Peter Kleinknecht repeated the offer. Peter Kleinknecht also stated that he believed "that only one union should be involved in this job, that anything else would be impractical and unreasonable and only give problems." Standley informed Peter Kleinknecht that he had no authority to respond to his offer, but that he would get back to him later.

On December 22, a meeting occurred at the jobsite among officials of J & H, Telecom and Kleinknecht about the work stoppage by Local 3 members. Peter and George Kleinknecht, Ley, Standley, and attorneys for Kleinknecht and J & H were present. When the Kleinknechts were asked if they had contacted Local 3, their attorney, Harvey Goldstein, directed them not to answer. When Goldstein was asked why the access work had stopped, he answered that Kleinknecht's contract with Local 3 would not permit it to work with any other union in the building.

On December 23, Telecom official Michael Zafarano telephoned Local 3's office to speak to Bernard Rosenberg, a Local 3 business representative who was responsible for the area that included the J & H jobsite. Rosenberg was not available and Zafarano left a message for a return call. The call was not returned. That same day, Telecom filed unfair labor practice charges with the NLRB's Manhattan Regional Office, and Local 3 was duly served with a copy of the charges.

The following day, Zafarano attempted to call Rosenberg again and spoke to Mike Takfor, another Local 3 business representative, when Rosenberg again was unavaila-

ble. Zafarano told Takfor that he wanted to speak with Rosenberg about a work stoppage by Kleinknecht electricians at the J & H jobsite. Zafarano received no reply to this call.

On December 27, Rosenberg instructed "some people" to visit the J & H jobsite to tell the electricians "to get back to work immediately [as] they had no right stopping." The next morning, December 28, Local 3 representatives went to the J & H jobsite and told the employees present—a group that did not include the vacationing Brown—to return to work. The employees resumed work the next day. Neither Brown nor the other employees were disciplined by Local 3 as a result of the work stoppage.

On January 4, 1982, a complaint issued alleging that Local 3 violated section 8(b)(4)(i) and (ii)(B) of the NLRA, 29 U.S.C. § 158(b)(4)(i) and (ii)(B) (1976),[3] by inducing and encouraging its members employed by Kleinknecht "to engage in a strike or refusal in the course of their employment to use, manufacture, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform services," and by threatening, coercing, and restraining Kleinknecht and J & H from "using, selling, handling, transporting, or otherwise dealing in the products of, and to cease doing business with, Telecom." Local 3 filed an answer and denied the commission of any unfair labor practice.

A hearing was held before an administrative law judge ("ALJ") in New York, New

---

**3.** Section 8(b)(4)(i) and (ii)(B) provides:
 (b) It shall be an unfair labor practice for a labor organization or its agents—...
 (4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—...

 (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title....

York, on March 29 and 30, 1982. The ALJ determined:

> Local 3 induced and encouraged its members to engage in a strike or to cease in the course of their employment to perform services for Kleinknecht, and restrained and coerced Kleinknecht, with whom Local 3 has no dispute, an object being to force and require Kleinknecht and J & H to cease doing business with Telecom. Accordingly, I find that Local 3 has violated Section 8(b)(4)(i) and (ii)(B) of the Act.

The ALJ determined that a broad order was necessary to prohibit "not only unlawful secondary activity directed to the secondary employers in this case with regard to disputes with the primary employers in this case, but also such activity directed to all secondaries with respect to all primaries." Further, the ALJ recommended that Local 3 publish a notice of its conduct and the Board's remedy at its own expense in a newspaper of general circulation in the New York metropolitan area. Finally, the ALJ recommended that the notice be published in Local 3's publication, *Electrical Union World*, and that copies of the publication be mailed to all Local 3 members at their home addresses.

On October 26, 1982, a three-member panel of the NLRB affirmed the ALJ's June 21, 1982, rulings, findings and conclusions regarding Local 3 and adopted the ALJ's recommended order, with minor modifications.[4] This petition for enforcement followed.

## II. DISCUSSION

The issues presented on appeal are: (1) whether substantial evidence on the record as a whole supports the NLRB's finding that Local 3 violated section 8(b)(4)(i) and (ii)(B) of the NLRA; and (2) whether the NLRB's order constitutes an appropriate exercise of its remedial discretion. We are in substantial agreement with the NLRB's actions regarding these issues. Therefore, we grant enforcement of the NLRB's order.

### A. Substantial Evidence

Section 8(b)(4)(i) and (ii)(B) of the NLRA, 29 U.S.C. § 158(b)(4)(i) and (ii)(B) (1976), commonly is referred to as the NLRA's secondary boycott provision. This section was enacted to implement "the dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own." *NLRB v. Denver Building & Construction Trades Council,* 341 U.S. 675, 692, 71 S.Ct. 943, 953, 95 L.Ed. 1284 (1951); *see also National Woodwork Manufacturers Association v. NLRB,* 386 U.S. 612, 625–27, 87 S.Ct. 1250, 1258–59, 18 L.Ed.2d 357 (1967); *NLRB v. Local Union No. 3, International Brotherhood of Electrical Workers (New York Telephone Co.),* 477 F.2d 260, 264 (2d Cir.), *cert. denied,* 414 U.S. 1065, 94 S.Ct. 572, 38 L.Ed.2d 470 (1973). The secondary boycott section prohibits a union from engaging in or inducing or encouraging strikes and picketing against an employer with whom it does not have a dispute, with an object of forcing that sec-

**4.** The NLRB rejected the ALJ's finding that Zafarano first telephoned Local 3's office on December 15, 1981. Further, the Board rejected the ALJ's finding that all Local 3 members were aware of the bylaw embodying the "total job" policy. Also, the NLRB changed section 1(b) of the ALJ's order. The section originally read:

> In any other manner inducing or encouraging any member employed by a person engaged in commerce or in an industry affecting commerce to engage in action proscribed by Section 8(b)(4)(i) or (ii)(B) of the Act in connection with enforcing a work jurisdictional claim involving work in or on any building

occupied by, or to be occupied by, Johnson & Higgins or any other employer or person. The NLRB's substituted paragraph reads:

> In any other manner inducing or encouraging any member employed by a person engaged in commerce or in an industry affecting commerce to engage in action proscribed by Section 8(4)(i) or (ii)(B) of the Act in connection with enforcing a work jurisdictional claim involving telephone interconnect work on projects on which Northern Telecom, Inc., or any other manufacturer, distributor, or installer of telephonic equipment is employed.

ondary employer to cease doing business with a primary employer. *See, e.g., Carrier Air Conditioning Co. v. NLRB*, 547 F.2d 1178, 1188–89 (2d Cir.1976), *cert. denied*, 431 U.S. 974, 97 S.Ct. 2940, 53 L.Ed.2d 1072 (1977); *NLRB v. Local 3, International Brotherhood of Electrical Workers (Wickham-Perone)*, 542 F.2d 860, 863–66 (2d Cir.1976).

■ "The words 'induce or encourage' are broad enough to include in them every form of influence and persuasion." *International Brotherhood of Electrical Workers v. NLRB*, 341 U.S. 694, 701–02, 71 S.Ct. 954, 958–59, 95 L.Ed. 1299 (1951) (footnote omitted); *see also Local Union No. 3, International Brotherhood of Electrical Workers (New York Telephone Co.)*, 477 F.2d at 264. The question of whether a union is responsible for inducing or encouraging secondary activity is a question of fact. *Id.* On appeal, the NLRB's determination of this question, and other factual questions, will be accepted if supported by substantial evidence on the record as a whole. 29 U.S.C. § 160(e) (1976); *see also Local Union No. 3, International Brotherhood of Electrical Workers (New York Telephone Co.)*, 477 F.2d at 264.

■ We are convinced that substantial evidence on the record as a whole supports the NLRB's finding that Local 3 induced and encouraged its employees to engage in a work stoppage with the unlawful object of pressuring secondary employers Kleinknecht and J & H to cease doing business with primary employer Telecom. The record clearly indicates that the foreman, Brown, and other members of Local 3, engaged in a work stoppage with the secondary object of furthering Local 3's dispute with Telecom, whose CWA-affiliated employees were performing work claimed by Local 3. Such activity is unlawful under section 8(b)(4)(i) and (ii)(B) of the NLRA.

Local 3 raises several objections regarding the NLRB's finding. First, Local 3 contends that the NLRB failed to apply the applicable standard for determining union agency as set forth in *Carbon Fuel Co. v. United Mine Workers of America*, 444 U.S. 212, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979). Local 3 insists that by applying common-law rules of agency, it would not be held liable for the acts of the foreman, Brown, even if the record established that he intended to benefit Local 3 rather than his employer, Kleinknecht.

The NLRB argues that, contrary to Local 3's assertions, its decision is consistent with the common-law rules of agency discussed in *Carbon Fuel*. We agree. In *Carbon Fuel*, the issue was:

whether an international union, which neither instigates, supports, ratifies, nor encourages "wildcat" strikes engaged in by local unions in violation of a collective-bargaining agreement, may be held liable in damages to an affected employer if the [international] union did not use all reasonable means available to it to prevent the strikes or bring about their termination.

444 U.S. at 213, 100 S.Ct. at 412. Acknowledging common-law agency principles, the Supreme Court found no liability because of the absence of evidence that the international or district union supported, ratified or encouraged any of the work stoppages. *Id.* at 216–18, 100 S.Ct. at 413–14. In fact, the Supreme Court noted that the international union "had repeatedly expressed its opposition to wildcat strikes." *Id.* at 218, 100 S.Ct. at 414.

*Carbon Fuel* is distinguishable from the situation here. First, in contrast to the *Carbon Fuel* situation, where the local union engaged in strikes not instigated, supported, ratified or encouraged by the international union, Brown acted in accordance with Local 3's "total job" policy and in conformity with his "obligation" to enforce that policy. Second, Local 3 is not a union that has "repeatedly expressed its opposition" to secondary boycotts. *Id.* at 218, 100 S.Ct. at 414. Third, contrary to any suggestion in Local 3's brief, *Carbon Fuel* did not establish a new test of agency. Rather, the Supreme Court acknowledged that "Congress limited the responsibility of unions for strikes in breach of contract to cases when the union may be found respon-

sible according to the common-law rule of agency." *Id.* at 216, 100 S.Ct. at 413 (footnote omitted). We see nothing in this case that contradicts *Carbon Fuel* and thus conclude that Local 3's contention is without merit.

Next, Local 3 contends that the Board's reliance upon evidence of Local 3's failure to discipline was misplaced. Local 3 insists that the NLRB was insensitive to the difficulties concomitant with imposing discipline on members of a union. Further, Local 3 purportedly is distressed because the NLRB did not suggest the type of discipline that should have been imposed.

The NLRB argues that, contrary to Local 3's suggestion, the failure to discipline Brown or any other union member, even though the International Brotherhood of Electrical Workers' constitution prohibits unauthorized work stoppages and provides that members be penalized for engaging in such actions,[5] supports the conclusion that Local 3 bears responsibility for the work stoppage. We agree. The ALJ succinctly expressed the NLRB's view of the evidence of failure to discipline—a view with which we agree:

> My conclusion that Local 3 is liable for the action taken by the employees is buttressed further by the fact that it took no action to discipline the men who participated in the work stoppage. Rosenberg insisted that upon discovering the work stoppage, he immediately instructed the employees, through other business agents, to return to work, and therefore as far as he was concerned, "the case was closed." Rosenberg concedes that he has no knowledge of any members of Local 3 ever being disciplined for work stoppages involving similar situations as found in this instant matter. I can only conclude that the failure of Local 3 to ever discipline any of its members for unilaterally taking actions contrary to the constitution of its international union

which provides for discipline is a signal to its members that such action taken by them will never result in any penalties. *See Local Union No. 3, International Brotherhood of Electrical Workers (L.M. Ericsson Telecommunications, Inc.),* 257 N.L.R.B. 1358, 1370 (1981), *enforced on consent,* No. 82-4030 (2d Cir. Apr. 5, 1982); *Local Union No. 3, International Brotherhood of Electrical Workers (Eastern States Electrical Contractors, Inc.),* 205 N.L.R.B. 270, 273 (1973); *see also NLRB v. Local Union No. 3, International Brotherhood of Electrical Workers (New York Telephone Co.),* 467 F.2d 1158, 1160 (2d Cir.1972) (per curiam) ("Moreover, the union has taken no disciplinary action against the three men."); *Local 3, International Brotherhood of Electrical Workers (General Dynamics Communications Co.),* 264 N.L.R.B. No. 96 (Sept. 30, 1982), *enforced mem.,* No. 83-4017 (2d Cir. June 17, 1983); *Local 3, International Brotherhood of Electrical Workers (New York Telephone Co.),* 140 N.L.R.B. 729, 740, *enforced,* 325 F.2d 561 (2d Cir.1963) (per curiam). In sum, Local 3's view, that the NLRB's reliance upon the evidence of failure to discipline was misplaced, is without merit.

Next, Local 3 contends that the NLRB's reliance upon the "total job" policy bylaw was erroneous. According to Local 3, "there was no evidence that this by-law had ever been enforced through any charge by Local 3 that any [of its members] had failed to obey it" or that the existence of this bylaw had a chilling effect on any person. The NLRB counters by pointing out that this bylaw, which incorporates Local 3's "total job" policy, repeatedly has been found to be the means by which Local 3 asserts its jurisdictional claim over the work that it regards as belonging to its members. Further, the NLRB argues that its reliance was not misplaced because the

---

**5.** Article XVII, section 13 of the International Brotherhood of Electrical Workers' constitution provides: "No [Local Union] shall cause or allow a stoppage of work in any controversy of a general nature before obtaining consent...."

Further, Article XXVII, section 1(3) provides that any member may be penalized for a "[v]iolation of any provision of this Constitution or the rules herein."

finding of Local 3's responsibility for this conduct did not rest on the bylaw alone.

Herein, the ALJ noted that the bylaw constituted an inducement or encouragement for the work stoppage. We agree. Over ten years ago, the NLRB summed up the effect of Local 3's "total job" bylaw:

The enforcement by a union of a bylaw which obligates members not to permit their own employers to assign to other tradesmen employed by him work falling within the work jurisdiction claimed by the union would not appear to be in violation of the Act. The bylaw here in issue, however, is so broadly worded as to obligate Local 3 members not to permit any other tradesmen to perform work within their claimed jurisdiction irrespective of the employer for whom such other tradesmen may be working. Obedience to the bylaw in situations such as that here presented therefore necessarily induces and encourages employees to refuse to perform services or to take other proscribed action with an object of forcing or requiring persons to cease doing business with other persons within the meaning of Section 8(b)(4)(i) and (ii)(B) of the Act.

This is not to say that the maintenance of the bylaw is in itself a violation. Rather, it constitutes the inducement and encouragement element of the 8(b)(4) violation which occurs when members, acting in obedience to the bylaw, cease their work for a proscribed project.

*Local Union No. 3, International Brotherhood of Electrical Workers (Eastern States Electrical Contractors, Inc.)*, 205 N.L.R.B. at 273 (footnote omitted). We agree with this analysis and conclude that the ALJ herein, affirmed by the NLRB, properly utilized this rationale as applied to the facts of this case. *See also Sheet Metal Workers' International Association v. NLRB*, 293 F.2d 141, 148–49 (D.C.Cir.), *cert. denied*, 368 U.S. 896, 82 S.Ct. 172, 7 L.Ed.2d 92 (1961); *Joliet Contractors Association v. NLRB*, 202 F.2d 606, 611–12 (7th Cir.), *cert. denied*, 346 U.S. 824, 74 S.Ct. 40, 98 L.Ed. 349 (1953); *Local Union*

*No. 3, International Brotherhood of Electrical Workers (L.M. Ericsson Telecommunications, Inc.)*, 257 N.L.R.B. at 1369–70; *Local 3, International Brotherhood of Electrical Workers (New York Telephone Co.)*, 140 N.L.R.B. at 740. We further note that the finding that Local 3 was responsible for the work stoppage did not rest on the bylaw alone. Local 3's responsibility for the work stoppage rested on a combination of evidence of a pattern of harassment, evidence of failure to discipline, and evidence that Local 3 was aware of the work stoppage before December 27.

Local 3 also contends that the NLRB's reliance upon Local 3's "proclivity" violated its right to a fair hearing. This contention is patently meritless. As the NLRB points out, it did not rely improperly on Local 3's proclivity, but properly considered the prior holdings before the NLRB that demonstrated "proclivity to engage in unlawful secondary activity in support of its claim to telephone interconnect work being performed by employees represented by the [CWA]." This was not an improper reliance, but was proper background evidence concerning prior similar unlawful activity used for evaluating Local 3's conduct herein and for purposes of determining an appropriate remedy. *See NLRB v. Lundy Manufacturing Corp.*, 316 F.2d 921, 927 (2d Cir.), *cert. denied*, 375 U.S. 895, 84 S.Ct. 171, 11 L.Ed.2d 124 (1963).

We have considered Local 3's other contentions as they relate to the substantiality of the evidence and they merit no discussion. We must note that Local 3 does not contest at all the NLRB's finding that the work stoppage had a secondary object. It can be concluded that the reason for this omission is because Local 3 engaged in proscribed conduct at the J & H jobsite through the actions of Brown and other Local 3 members in furtherance of the "total job" policy that is embodied in its bylaws. Although Local 3 is free to attempt to gain work for its members through lawful, primary action, it is not privileged to pursue its "total job" policy while disregarding the statutory restriction against secondary pressure. Herein, substantial

evidence on the record as a whole supports the NLRB's finding that Local 3 disregarded the statutory restriction against secondary pressure. In sum, Local 3 violated section 8(b)(4)(i) and (ii)(B) by inducing and encouraging Brown and other Local 3 members to engage in a work stoppage with the unlawful object of pressuring secondary employers Kleinknecht and J & H to cease doing business with primary employer Telecom.

### B. *The Order*

 Section 10(c) of the NLRA, 29 U.S.C. § 160(c) (1976), states in pertinent part:

If upon the preponderance of the testimony taken the Board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, then the Board shall state its findings of fact and shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action ... as will effectuate the policies of this subchapter.

In this section, Congress has delegated to the NLRB the authority to determine when the policies of the NLRA would be effectuated by a particular remedy. *Shepard v. NLRB,* 459 U.S. 344, 103 S.Ct. 665, 669, 74 L.Ed.2d 523 (1983); *NLRB v. Food Store Employees Union, Local 347,* 417 U.S. 1, 8, 94 S.Ct. 2074, 2079, 40 L.Ed.2d 612 (1974); *NLRB v. Associated Musicians of Greater New York, Local 802,* 422 F.2d 850, 852 (2d Cir.1970) (per curiam). Therefore, courts usually will give special respect to the NLRB's formulation of remedies. *Shepard,* 103 S.Ct. at 669; *Teamsters Local 115 v. NLRB,* 640 F.2d 392, 399 (D.C.Cir.), *cert. denied,* 454 U.S. 827, 102 S.Ct. 119, 70 L.Ed.2d 102 (1981). This policy also is expressed by stating that the NLRB's choice of remedies is given a high degree of deference, *Teamsters Local 115,* 640 F.2d at 399, and that the NLRB has broad discretion when fashioning a particular remedy. *Detroit Edison Co. v. NLRB,*

440 U.S. 301, 316, 99 S.Ct. 1123, 1131, 59 L.Ed.2d 333 (1979); *Bagel Bakers Council of Greater New York v. NLRB,* 555 F.2d 304, 305 (2d Cir.1977) (per curiam); *NLRB v. Jack La Lanne Management Corp.,* 539 F.2d 292, 295 (2d Cir.1976). On review, the NLRB's choice of remedies is subject to limited judicial scrutiny. *Teamsters Local 115,* 640 F.2d at 399; *Bagel Bakers Council of Greater New York,* 555 F.2d at 305. This choice will not be disturbed " 'unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act.' " *Fibreboard Paper Products Corp. v. NLRB,* 379 U.S. 203, 216, 85 S.Ct. 398, 405, 13 L.Ed.2d 233 (1964) (quoting *Virginia Electric & Power Co. v. NLRB,* 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943)); *see also Teamsters Local 115,* 640 F.2d at 399. Thus, the choice of remedies may be disturbed if it is shown that the choice is punitive rather than remedial. *Local 60, United Brotherhood of Carpenters and Joiners v. NLRB,* 365 U.S. 651, 655, 81 S.Ct. 875, 877, 6 L.Ed.2d 1 (1961); *Florida Steel Corp. v. NLRB,* 620 F.2d 79, 82 (5th Cir.1980).

Herein, the NLRB formulated a remedial scheme which contained several component parts. First, the NLRB directed Local 3 to post the following notice:

WE WILL NOT apply our bylaws in such a manner as to induce or encourage any member employed by George Kleinknecht, Inc., or any other person engaged in commerce or in an industry affecting commerce, to engage in a strike or a refusal in the course of his employment to perform any service, or in such a manner as to restrain or coerce George Kleinknecht, Inc., or any other person affecting commerce, where, in either case, an object thereof is to force or require George Kleinknecht, Inc., Johnson & Higgins, and any other subcontractors on the jobsite at 95 Wall Street, New York, New York, to cease doing business with Northern Telecom, Inc., or any other employer or person.

WE WILL NOT in any other manner induce or encourage any member em-

ployed by a person engaged in commerce or in an industry affecting commerce to engage in action proscribed by Section 8(b)(4)(i) and (ii)(B) of the National Labor Relations Act in connection with enforcing a work jurisdictional claim involving telephone interconnect work on projects on which Northern Telecom, Inc., or any other manufacturer, distributor, or installer of telephonic equipment is employed.

WE HEREBY NOTIFY each of our members that no provision in our bylaws is intended to suggest or require that any member refuse, in the course of his employment, to perform any services because work falling within our claimed jurisdiction is assigned to, or is being performed by other tradesmen or other persons not in the employ of his own employer or over whom he has no control.

Second, the NLRB ordered Local 3 to publish the text of the above notice in its semimonthly publication, *Electrical Union World;* to mail a copy of *Electrical Union World* to each member of Local 3; to post copies of the notice in conspicuous places in the business offices, meeting halls and other places where notices are posted; to deliver copies of the notice to George Kleinknecht, Inc., for posting at places where notices to its employees or Local 3 members are customarily posted; to publish at its own expense the terms of the notice in a daily newspaper of general circulation in the New York metropolitan area on three separate days within a three-week period; and to notify the Regional Director for Region Two in writing within 20 days from the day of the order of the steps taken in compliance with the above.

Local 3 challenges two aspects of the order. First, Local 3 contends that the NLRB's order is unwarranted and unjust because it requires that the union cease all secondary activity. Second, Local 3 asserts that it should not be required to pay thousands of dollars in order that millions of nonmembers will have an opportunity to read the notice in the order.

The NLRB contends that its order is an appropriate exercise of remedial discretion. It asserts that the order is necessary to prevent future violations; that Local 3's conduct on this record and in the past requires an order of this scope; and that the publication requirement is reasonable.

■ We agree with the NLRB that the order constitutes an appropriate exercise of its remedial discretion. In sum, the component parts of the remedy are traditional. They are far from imaginative or innovative and, if anything, may be considered somewhat bland considering Local 3's long history of unlawful secondary activity. We are unpersuaded by Local 3's plea that the breadth of the order is excessive. The breadth of an order turns on the circumstances of the particular case. *NLRB v. Express Publishing Co.,* 312 U.S. 426, 436, 61 S.Ct. 693, 699, 85 L.Ed. 930 (1941); *Motion Picture Studio Mechanics, Local 52 v. NLRB,* 593 F.2d 197, 200 (2d Cir.1979). Further, it is settled that the NLRB has remedial discretion to fashion an order designed "to prevent violations, the threat of which in the future is indicated because of their similarity or relation to those unlawful acts which the Board has found to have been committed." *Express Publishing Co.,* 312 U.S. at 436, 61 S.Ct. at 699; *see also Associated Musicians of Greater New York, Local 802,* 422 F.2d at 851–52. Herein, it is clear that Local 3 is an incorrigible secondary boycotter with a two-decade-long history of secondary boycott activity that has been documented before the NLRB and this court. *NLRB v. Local Union No. 3, International Brotherhood of Electrical Workers (New York Telephone Co.),* 477 F.2d 260 (2d Cir.), *cert. denied,* 414 U.S. 1065, 94 S.Ct. 572, 38 L.Ed.2d 470 (1973); *NLRB v. Local Union No. 3, International Brotherhood of Electrical Workers (New York Telephone Co.),* 467 F.2d 1158 (2d Cir.1972) (per curiam); *Local 3, International Brotherhood of Electrical Workers (General Dynamics Communications Co.),* 264 N.L.R.B. No. 96 (Sept. 30, 1982), *enforced mem.,* No. 83–4017 (2d Cir. June 17, 1983); *Local Un-*

ion No. 3, International Brotherhood of Electrical Workers (L.M. Ericsson Telecommunications, Inc.), 257 N.L.R.B. 1358 (1981), enforced on consent, No. 82–4030 (2d Cir. Apr. 5, 1982); Local Union No. 3, International Brotherhood of Electrical Workers (Eastern States Electrical Contractors, Inc.), 205 N.L.R.B. 270 (1973); Local Union No. 3, International Brotherhood of Electrical Workers (Western Electric Co.), 141 N.L.R.B. 888 (1963); Local 3, International Brotherhood of Electrical Workers (New York Telephone Co.), 140 N.L.R.B. 729 (1963). Under these circumstances, we believe the NLRB was justified in fashioning an order that is designed to protect employers from the unlawful secondary activity that Local 3 has utilized so frequently over the last two decades. Based on the circumstances of the present case, there is no indication that Local 3 has changed its conduct, or in the near future, will do so. A likelihood of similar behavior will support a broad order of the type herein. NLRB v. Local 282, International Brotherhood of Teamsters, 428 F.2d 994, 1000 (2d Cir.1970). "Unless broad [orders] of this sort are permissible, an unscrupulous union can continue with relative impunity to use illegal coercion against employers." Id.

Further, the NLRB has a duty to impose "broader and more stringent remedies against a recidivist than those usually invoked against a first offender." Containair Systems Corp. v. NLRB, 521 F.2d 1166, 1171 (2d Cir.1975). Local 3, with its well-demonstrated proclivity for unlawful secondary pressures, is hardly in a position to complain that the order imposed is too broad. When a narrow prohibition is plainly inadequate because of a union policy of unlawful activity, " 'it is not necessary that all of the untraveled roads to that end be left open and that only the worn one be closed.' " International Brotherhood of Electrical Workers, 341 U.S. at 706, 71 S.Ct. at 960 (quoting International Salt Co. v. United States, 332 U.S. 392, 400, 68 S.Ct. 12, 17, 92 L.Ed. 20 (1947)). With a broad order in place, "the Board has a basis for prosecution of [Local 3] for con-

tempt if it should continue its violations, even though its future transgressions involve different employers." Containair Systems Corp., 521 F.2d at 1173–74. We believe that the NLRB should have the opportunity to pursue such a course, if necessary in the future.

We also are unpersuaded by Local 3's contention that the provision in the NLRB's order requiring publication of a notice three times in a newspaper of general circulation in the New York metropolitan area is unreasonable. Similar requirements have been approved by the courts and the NLRB. See Teamsters Local 115, 640 F.2d at 401; NLRB v. Union Nacional de Trabajadores, 540 F.2d 1, 12 (1st Cir.1976), cert. denied, 429 U.S. 1039, 97 S.Ct. 736, 50 L.Ed.2d 750 (1977); International Association of Bridge, Structural & Ornamental Ironworkers, Local 480, 235 N.L.R.B. 1511, 1514 (1978). As the First Circuit stated in enforcing a similar publication order, "[W]here the violations are flagrant and repeated, [such a] publication order has the salutary effect of neutralizing the frustrating effects of persistent illegal activity by letting in a 'warming wind of information and, more important, reassurance.' " Union Nacional de Trabajadores, 540 F.2d at 12 (quoting J.P. Stevens & Co. v. NLRB, 417 F.2d 533, 540 (5th Cir.1969)). This reasoning certainly applies here.

## III. CONCLUSION

For the foregoing reasons, we grant enforcement of the NLRB's order in full. Substantial evidence supports the NLRB's finding of unlawful secondary activity by Local 3. Further, the remedy formulated herein is consistent with the NLRA and more than reasonable considering the facts of this case and Local 3's long history of interfering with the protected rights and free choices of those whom it believes are in conflict with its "total job" policy. Enforcement granted.