NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

LOCAL 3, INTERNATIONAL BROTH-
ERHOOD OF ELECTRICAL
WORKERS, Respondent.

Docket No. 04–5912–AG.

United States Court of Appeals,
Second Circuit.

Argued: Feb. 1, 2006.

Decided: Dec. 20, 2006.

Stanley R. Zirkin, Assistant General Counsel (Polly Misra, Attorney, Contempt Litigation and Compliance Branch; Arthur G. Rosenfeld, Acting General Counsel; John E. Higgins, Jr., Deputy General Counsel; John H. Ferguson, Associate General Counsel, on the brief), National Labor Relations Board, Washington, D.C., for Petitioner.

Richard S. Brook (Patricia E. Palmieri, on the brief), Law Office of Richard S. Brook, Mineola, NY, for Respondent.

Colleran, O'Hara & Mills LLP (Edward J. Groarke and Stephanie Suarez, on the brief), Garden City, NY, for Amici Curiae New York State AFL–CIO and New York City Central Labor Council.

Before CALABRESI and STRAUB, Circuit Judges, and DRONEY, District Judge.[1]

DRONEY, District Judge.

Petitioner National Labor Relations Board ("NLRB" or "Board") brought this petition for adjudication of civil contempt against respondent labor union Local 3, International Brotherhood of Electrical Workers, AFL–CIO ("Local 3"), seeking to enforce a judgment of this Court entered on June 17, 1983 ("1983 Judgment") and a consent order entered on July 17, 1996 ("1996 Consent Order"). The Court appointed John S. Martin, Jr., Esq., as Special Master to conduct a hearing on the Board's contempt application. Upon hearing all the evidence, Special Master Martin ("Special Master" or "Master") issued findings of fact and conclusions of law on April 7, 2005; a supplemental ruling on the issue of attorneys' fees on May 6, 2005; and recommendations with respect to remedies on July 25, 2005, as amended on August 1, 2005. Both the Board and Local 3 have filed objections to the Special Master's findings of fact, conclusions of law, and

---

1. The Honorable Christopher F. Droney, United States District Court for the District of Connecticut, sitting by designation.

recommended remedies. We presume the parties are familiar with the facts, the procedural history, and the scope of issues presented for review here, which we reference only as necessary to support our decision. As discussed below, we affirm the Special Master's findings of fact and conclusions of law in their entirety. We adopt and affirm, with some modifications, the Special Master's recommendations concerning remedies.

## I. Background[2]

Local 3 is a labor union whose organizing activities have been oft-reviewed by this Court. *See NLRB v. Local 3*, 861 F.2d 44, 45–46 (2d Cir.1988) (per curiam) (discussing Local 3's "long history of unfair labor practices" and its involvement in prior litigation before this Court and in administrative proceedings before the Board). The 1983 Judgment and 1996 Consent Order implicated in this case specifically discussed Local 3's responsibilities to abide by Section 8(b)(4) of the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* Section 8(b)(4) is commonly referred to as the Act's "secondary boycott" provision, which prohibits any labor organization from "picketing against an employer with whom it does not have a dispute, with an object of forcing that secondary employer to cease doing business with a primary employer." *NLRB v. Local 3*, 730 F.2d 870, 875–76 (2d Cir.1984).

In its petition for civil contempt, the Board alleged that Local 3 had violated the 1983 Judgment, the 1996 Consent Order, and Section 8(b)(4) by conducting illegal secondary boycotts on two occasions. In the first incident, the Hertz rental car facility located at New York's John F. Kennedy Airport needed electrical work. Hertz hired Mac K Construction ("Mac

K") as its general contractor for the project, and Mac K in turn hired Gunzer Electric ("Gunzer") as an electrical subcontractor. Local 3's primary dispute was with Gunzer; by its own admission, Local 3 had no dispute with Hertz or Mac K. Local 3 picketed Gunzer at the Hertz site on various dates in April and May 2003; the Board alleged that this picketing was not temporally limited to days when Gunzer was actually working, nor was it geographically limited to Gunzer's specific gate at the work site and instead unlawfully impeded on neutral employees' and customers' entrances to Hertz. According to the Board, Local 3 attempted to interrupt Hertz's normal operations by conducting an illegal "shop-in," delaying and otherwise disrupting the car rental business. On four days of picketing, a Local 3 picketer brought an approximately ten-foot-high inflatable rat balloon to the picket line bearing a sign around its neck that read "HURTS IS A RAT." The Board argued that this use of the inflatable rat balloon also constituted illegal secondary boycotting.

The Board also alleged that Local 3 had violated the secondary boycott provisions during pickets conducted at New York City's Empire State Building in August 2004. The Empire State Brewing Corporation, doing business as Heartland Brewery, sought to build a restaurant within the Empire State Building. Again, Local 3's dispute in this construction project was limited to the electrical subcontractor, in this instance a company called R & L Systems. The Board alleged that despite having notice of the hours during which R & L Systems employees would be working at the restaurant site, Local 3 refused to confine its picketing to those hours and delayed the completion of the project. Fi-

---

**2.** This description is taken from the parties' statements of fact to this Court and the Spe-cial Master. The facts herein are undisputed unless otherwise noted.

nally, the Board alleged that various Local 3 business representatives involved in these pickets failed to receive copies of the relevant court orders binding Local 3, as required by the 1996 Consent Order.

## II. Discussion

### A. The Findings of Civil Contempt Against Local 3

■ The Board had the burden of proving Local 3's alleged contempt before the Special Master by clear and convincing evidence. *See, e.g., NLRB v. J.P. Stevens & Co., Inc.,* 464 F.2d 1326, 1328 (2d Cir. 1972) (per curiam); *NLRB v. J.P. Stevens & Co., Inc.,* 563 F.2d 8, 14 (2d Cir.1977). Because the Board sought a judgment of civil rather than criminal contempt, it did not have to show willfulness by Local 3.[3]

The Special Master found that the Board had met its burden, and concluded that Local 3 had violated the 1983 Judgment and 1996 Consent Order when it engaged in two unlawful secondary boycotts in violation of Section 8(b)(4) of the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* The Special Master found a third instance of civil contempt for Local 3's failure to provide certain of its business representatives with copies of the 1983 Judgment and 1996 Consent Order, as required by the terms of that Consent Order. Those conclusions were based on detailed findings of fact, as well as the Special Master's general finding that

> Having had the opportunity to observe all of the witnesses, the Special Master

finds that the witnesses presented by the NLRB were truthful and candid and that, to the extent that witnesses called by Local 3 contradicted the testimony of the NLRB witnesses, their contradictory testimony was not worthy of belief.

Findings of Fact and Conclusions of Law, April 7, 2005, at 2.

■ Our "review of [the Special Master's] conclusions is a limited one," as we must accept his findings of fact unless they are "clearly erroneous." *NLRB v. J.P. Stevens & Co., Inc.,* 563 F.2d at 14. While the Special Master's conclusions of law merit no particular deference, his determinations of credibility are "entitled to great weight." *Id.* at 18. Therefore, "it is ordinarily from the testimony *credited by the Master* that our assessment of whether clear and convincing evidence exists must be made." *Id.* (emphasis added). With this standard in mind, and upon review of the proceedings below, we cannot find that the Special Master's factual findings were clearly erroneous. We additionally find that he applied the correct legal standard to those facts, and therefore we uphold in their entirety the Special Master's conclusions that Local 3 violated the prior orders of this Court, and we adjudge Local 3 guilty of civil contempt in the three circumstances identified by the Special Master.

### B. The Special Master's Recommended Remedies

■ Having upheld the Special Master's findings of civil contempt, we turn now to

---

**3.** In one section of its appellate brief, Local 3 argues that one of the Special Master's recommended remedies, an increase in prospective fines for any future violations by Local 3, transformed the proceeding before the Special Master from one of civil to criminal contempt. We discuss (and reject) that argument *infra.* Local 3, though it objects to the Special Master's conclusion that it was in civil

contempt, does not challenge the "clear and convincing" standard for such a finding. Finally, we note in passing that although no element of willfulness is required for a finding of civil contempt, the Special Master nonetheless found that "[w]illfulness ha[d] ... been established." Findings of Fact and Conclusions of Law, April 7, 2005, at 11.

his recommended remedies. Our powers here are more plenary, as the Court is "not bound by the narrow scope of review applicable to the Master's factual findings, but instead may accept, reject, or modify his recommendations in order to provide 'full remedial relief.'" *Id.* at 22 (internal citation omitted) (quoting *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192, 69 S.Ct. 497, 93 L.Ed. 599 (1949)). Both the Board and Local 3 have objected to various recommended remedies. We evaluate each objected-to provision in turn.

### 1. The Prospective Fines from the 1996 Consent Order

██ The 1996 Consent Order called for prospective compliance fines against Local 3 of $5,000 for each and every future violation of the 1983 Judgment, with additional fines of $250 per day in the case of a continuing violation. Applying this rubric, the Master recommended imposing a total compliance fine of $33,250 against Local 3 ($20,000 for the four separate 2 instances in which Local 3 failed to provide copies of the 1983 Judgment and 1996 Consent Order to its business representatives, $7,500 for the eleven days of illegal secondary boycotting at the Hertz facility, and $5,750 for the four days of illegal secondary boycotting at the Heartland Brewery facility). Local 3 objects to this fine on two grounds: first, that the $20,000 assessed for failure to provide documents to its business representatives exceeds the amount sought by the Board; and second, that imposition of these fines converts the proceeding from one of civil to that of criminal contempt because Local 3 was not provided the "opportunity to purge" its contempt according to the dictates of *Int'l Union, United Mine Workers v. Bagwell*, 512 U.S. 821, 829, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994).

Local 3's first objection is easily disposed of. Although it is true that the Board only sought a $5,000 fine for the union's failure to provide copies of the 1983 Judgment and 1996 Consent Order, the Special Master was not charged merely to approve or disapprove the Board's preferred remedies, but rather to fashion the remedial relief he found appropriate.[4] The Master directly addressed his divergence from the Board's view in his recommendations:

> It appears to the Special Master ... that $20,000 is the appropriate fine [for this violation], because the failure to provide the required documentation to (and obtain the mandated acknowledgments from) four different business representatives on four distinct dates amounts to four separate violations.

Recommendations of the Special Master with Respect to Remedies, July 25, 2005, at 4 n. 1 (hereafter, "Recommendations"). Again, we cannot conclude that the Master's factual findings with regard to these violations were clearly erroneous, and therefore we uphold the application of $20,000 in compliance fines for those four discrete violations of the 1983 Judgment and 1996 Consent Order.

Nor do we find that the imposition of such fines violates the precepts of the *Bagwell* decision. In *Bagwell*, a Virginia state court judge enjoined the United Mine Workers from committing various labor law violations. That judge subsequently found the labor organization in civil contempt and assessed approximately $52 million in noncompensatory fines for violations of the injunction. Upon review, the United States Supreme Court expressed its concern with the dangers of contempt "proceedings [that] leave the offended

---

**4.** We note in passing that although the Board initially sought a fine of $5,000 for these violations, it has filed no objection to the imposition of the higher $20,000 fine.

judge solely responsible for identifying, prosecuting, adjudicating, and sanctioning the contumacious conduct." *Bagwell,* 512 U.S. at 831, 114 S.Ct. 2552. It found that the *Bagwell* prosecution should have been considered a proceeding in criminal contempt, as the fines assessed were criminal and punitive rather than civil and coercive. Before such fines could be imposed, the affected labor organization merited the right to jury trial and the opportunity to purge its contempt " 'as a protection against the arbitrary exercise of official power.' " *Id.* at 832, 114 S.Ct. 2552 (quoting *Bloom v. Illinois,* 391 U.S. 194, 202, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968)).

We find, as did the Special Master, that the instant situation is distinct from *Bagwell* and more closely analogous to the Ninth Circuit's decision in *NLRB v. Ironworkers Local 433,* 169 F.3d 1217 (9th Cir.1999). In the latter decision, the Ninth Circuit also was tasked with evaluating a consent order between the NLRB and a labor organization. The panel noted that *Bagwell* was an "unusual" situation not involving the NLRB, and that "no court has ever held that [NLRB] enforcement proceedings are criminal in nature, for the [National Labor Relations Act] is generally regarded to be a civil regulatory and remedial statute." *Id.* at 1219. Compliance fines under the consent order could be considered civil in nature, as their imposition "would serve the purpose of coercing future compliance with the consent decree." *Id.* at 1222. Finally, the *Ironworkers* decision held that the labor organization had no right to purge its contempt under the terms of the consent order: "[T]he Union can be adjudged in contempt

even if it is no longer violating the order, because it had the opportunity to avoid the fine by not engaging in the prohibited conduct in the first place." *Id.* at 1221.

For the same reasons enumerated by the Ninth Circuit in *Ironworkers,* we find that the imposition of compliance fines against Local 3 (according to a schedule to which they explicitly agreed in the 1996 Consent Order) is not precluded by the *Bagwell* decision. Local 3's objection is overruled, and we uphold that portion of the Special Master's recommended remedies assessing $33,250 in compliance fines against Local 3.

### 2. The Recommended Increase in Prospective Fines

■ In addition to fining Local 3 under the terms of the 1996 Consent Order, the Master also recommended increasing the fine schedule for future violations of the order, as the existing fines "ha[ve] proven to be inadequate" and "a significant increase is appropriate to coerce future compliance." Recommendations at 7. The Special Master recommended increasing the prospective compliance fines to $25,000 per violation and an additional $5,000 per day for each day that a violation continued. *Id.*[5] The Special Master also recommended the imposition of prospective individual fines of $2,000 per violation and $200 for each additional day against any "Local 3 officer, employee, agent, representative, or any other person (including picketers) acting in concert or participation with Local 3" in violating the 1996 Consent Order. Local 3 objects that any increase in the prospective fines also violates the precepts

---

**5.** In its objections, Local 3 avers that, at one point in his Recommendations, the Special Master stated the prospective fines should be increased to $50,000 rather than $25,000. Local 3 also objects to fines at that higher amount. We cannot find any reference to a

$50,000 figure. In any case, the Recommendations and their supplemental amendments of August 1, 2005 repeatedly refer to increased compliance fines of $25,000 per violation, and it is that amount we will consider here.

of the *Bagwell* decision, and that the imposition of fines against individuals is unwarranted.

We do not agree that increasing the prospective fines against Local 3 violates *Bagwell,* for the same reasons discussed previously. We also note that the Court retains the ability to modify a consent order to insure the order's intended objectives; the presence of a consent order "vests the court with equitable discretion to enforce the obligations imposed on the parties.... The court's interest in protecting the integrity of such a decree justifies any reasonable action taken by the court to secure compliance." *United States v. Local 359,* 55 F.3d 64, 69 (2d Cir.1995) (internal citations and quotation marks omitted); *see also EEOC v. Local 580, Int'l Ass'n of Bridge, Structural, and Ornamental Ironworkers,* 925 F.2d 588, 593 (2d Cir.1991) (holding that courts possess "inherent power to enforce consent judgments, beyond the remedial 'contractual' terms agreed upon by the parties"). Given the Special Master's conclusion that severe sanctions are necessary to ensure Local 3's compliance with the orders of this Court, and the uncontested finding that Local 3 possesses more than $33 million in assets, the proposed increase in the prospective fines seems necessary and not unduly onerous. Local 3's objection is overruled in part, as we uphold the recommended increase in prospective fines against Local 3 itself.

We decline, however, to impose new prospective fines on Local 3's individual officers, agents, representatives, or members for violations of the 1996 Consent Order. Any contumacious activity by such persons also may be imputed to Local 3; relief for such conduct may be sought by bringing a contempt action against the union, thereby allowing the Board to fulfill its objectives without running the risk of chilling legitimate organizing activity by individual members of the organization. We therefore sustain Local 3's objection in part, and the Special Master's recommendations are denied as to this provision.

### 3. The Award of Attorneys' Fees to the Board

■ The Special Master found both that the Board was entitled to receive costs and attorneys' fees as a prevailing party, and that these fees should "be calculated by reference to the prevailing private practice market rate." Recommendations at 8. Local 3 objects to the private market rate metric for reimbursement, arguing that the Board should only receive reimbursement for the attorneys' fees it actually incurred (*i.e.,* the Board should be reimbursed at government salary rates, which are lower than those paid to attorneys in private practice). Local 3 also argues in its brief (though not in its formal objections) that the Board's attorneys' travel time should be reimbursed at 50% of the private market rate.

As the Board urges, in *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), the Supreme Court held that attorneys' fees awarded to a nonprofit legal aid organization under 42 U.S.C. § 1988 "are to be calculated according to the prevailing market rates in the relevant community, regardless of whether plaintiff is represented by private or nonprofit counsel." *Id.* at 895, 104 S.Ct. 1541. Courts have applied *Blum* to calculate government attorneys' fees in a variety of contexts beyond civil rights litigation. *See, e.g., United States v. City of Jackson,* 359 F.3d 727, 732–34 (5th Cir.2004) (awarding government attorneys' fees based on prevailing rate in contempt proceeding concerning fair housing standards); *Napier v. Thirty or More Unidentified Federal Agents, Employees, or Officers,* 855 F.2d 1080, 1092–93 (3d Cir.1988) (applying

*Blum* where 2 government sought attorneys' fees in context of Rule 11 sanctions); *NLRB v. Graveley Bros. Roofing*, 162 L.R.R.M. 2841 (3d Cir.1999) (applying *Napier* to award NLRB prevailing market rates); *see also United States v. Big D. Enterprises, Inc.*, 184 F.3d 924, 936 (8th Cir.1999) (awarding prevailing rate to government attorneys in context of Rule 37 sanctions). Consistent with this precedent, district courts in this Circuit generally employ market rates to calculate awards of government attorneys' fees. *NLRB v. A.G.F. Sports Ltd.*, 146 L.R.R.M. 3022, 3023 (E.D.N.Y.1994); *United States v. Kirksey*, 639 F.Supp. 634, 637 (S.D.N.Y. 1986).

We also note that because government attorneys receive a fixed salary and do not bill a client for their services, a proportionate share of attorneys' salaries does not necessarily correlate to expenses actually incurred in pursuing a given case. Last, we note that pursuing a contempt action imposes additional costs on the government in the form of foregone opportunities to pursue other cases according to its statutory duty. For those reasons, the Special Master properly calculated the Board's attorneys' fees according to the prevailing market rate.[6]

### 4. The Imposition of Additional Affirmative Remedies

■ In an effort to coerce future compliance by Local 3, the Special Master recommended additional affirmative remedies be imposed against the union. Those remedies consist of various forms of heightened supervision of picketing activity, including requiring the posting of a notice discussing the adjudication of civil contempt and the requirements of the 1996 Consent Order; distribution of that notice to all of Local 3's officers, agents, business representatives, and members; requiring picketers to sign acknowledgments that they have received written instructions on lawful picketing and to sign a daily log while picketing, which log should be provided to the Board on request; and directing Local 3 to provide certain discovery material to the Board upon the filing of a unfair labor practice charge. Local 3 objects to these affirmative remedies, alleging that they are unnecessary and will intrude upon Local 3's ability to engage in lawful picketing.[7]

We sustain Local 3's objection in part. While it is true that "the NLRB has a duty to impose broader and more stringent remedies against a recidivist than those usually invoked against a first offender," *NLRB v. Local 3*, 730 F.2d 870, 881 (2d Cir.1984), some of the recommended remedies come uncomfortably close to chilling legitimate labor activity, particularly those targeting rank-and-file members of Local 3. As set forth in the conclusion we will exercise our discretion to modify the Master's recommendations in this section.

### 5. The Imposition of a Reimbursable Fine

■ The Special Master also recommended granting the Board's request that

---

6. We also hold, in accordance with the supplemental affidavits submitted by the Board's attorneys, that the amount of fees and costs awarded to the Board be increased to $247,015.03, reflecting their additional costs incurred since the Special Master's order.

7. Though not included in its formal objections, Local 3 objects in its brief to this Court that the Special Master's recommendation that it be prohibited from "utilizing symbols of labor unrest (including, but not limited to the inflatable rat balloon) in an effort to enmesh neutral employers and employees" in the union's labor disputes is overbroad and chills potentially legal organizing activity. We decline to reach the legality of the inflatable rat balloon under all circumstances, but modify the Special Master's recommendation as indicated *infra*.

Local 3 be required to deposit $50,000 in escrow with the United States District Court for the Eastern District of New York, to be refunded once the union has paid the Board's cost and expenses, and complied with the notice-posting provisions and gathering of written statements elsewhere recommended by the Master. Local 3 has objected to this recommendation, arguing that it is unnecessary. We agree. Given Local 3's uncontradicted financial statements showing that it possesses over $33 million in assets, there is no reason to believe that it cannot pay the Board approximately $250,000 in fees and costs, nor any reason to hold a far smaller amount in escrow until such payment is made. Local 3's objection is sustained, and we decline to impose the Special Master's recommendation as to this provision.

### 6. The Denial of Compensatory Relief to Private Parties

■ In its petition for adjudication of contempt, the Board sought to recover damages suffered by private employers injured by Local 3's contumacious secondary boycotts. The Special Master declined to recommend such a remedy, finding it inappropriate to award damages to parties who were not complainants in the action, and noting that any injured private employer could seek a direct remedy from Local 3 under Section 303 of the Labor Management Relations Act, 29 U.S.C. § 187. The Board has objected to this denial of compensatory relief and claims that the Special Master erred as a matter of law in declining to award such damages.

We overrule the Board's objection. The Special Master correctly pointed out that the Board failed to cite "any precedent in which it was permitted to collect damages on behalf of private employers within the auspices of a contempt proceeding." In addition, our decision in New York v. Oper-

ation Rescue Nat'l, 80 F.3d 64 (2d Cir. 1996), supports the Special Master's conclusion. There, in a contempt proceeding brought by the state only, we vacated the award of compensatory damages to third parties who had been injured by anti-abortion protesters' violation of an injunction. We explained that while "New York has standing to enforce compliance ... by seeking injunctive relief, noncompensatory fines, and compensation for any economic loss New York may have suffered," the state's "standing does not extend to vindication of the private interests of third parties." Id. at 71.

Finally, as the Special Master noted, employers may bring their own action for damages under Section 303. Accordingly, we decline to award damages to the third-party employers here.[8]

### C. Payment of the Special Master's Costs and Fees

■ The Special Master made no recommendation as to which party should pay his own costs and fees. As the Board is the prevailing party in this matter, we order that Local 3 be required to pay these costs, which by the Special Master's invoice total $35,798.76, directly to the Special Master.

### III. Conclusion

For the foregoing reasons, the Special Master's Findings of Fact and Conclusions of Law are ADOPTED AND AFFIRMED. The Special Master's motion for compensation in the amount of $35,798.76 is GRANTED. The Recommendations of the Special Master with Respect to Remedies, issued July 25, 2005 and as amended August 1, 2005 and contained in the "Conclusion" section of that document, are ADOPTED AND AFFIRMED, AS MODIFIED:

---

**8.** This conclusion is limited to the circumstance, such as here, where the employer may bring its own action for damages. This court has ordered back pay to employees as part of Board-initiated contempt proceedings. See NLRB v. J.P. Stevens & Co., Inc., 96, L.R.R.M. (BNA) 2748 (2d Cir.1977) (per curiam).

Paragraph 3(a) is deleted.[9]

The figure of $218,366.53 in paragraph 3(b) is stricken and replaced by the figure of $247,015.03, reflecting the Board's additional costs.

Paragraph 3(d) is amended to read, "Refraining from threatening neutral employers with economic action in order to cause them to cease doing business with a primary employer; from picketing at entrances properly reserved for neutral persons; from picketing at times when the primary employer is not engaged in his normal business at job sites; from impeding ingress or egress at job sites; from engaging in mass picketing; from employing the tactic of group shopping or 'shopins'; and from utilizing the inflatable rat balloon in connection with illegal secondary picketing;"[10]

Paragraph 3(m) is amended to read only, "At the outset of any future picketing by any representatives or agents of Local 3 or under its auspices, holding a meeting with all Local 3 officers, employees, representatives, agents, and picketers who will be participating in the picketing during which the participants shall be informed about the requirements of this adjudication and the Court's orders. Written instructions shall be distributed, read, and discussed at the meeting. No agent or member of Local 3 may participate in the picketing without having received such instructions;"[11]

Paragraph 3(n) is amended to read "At the outset of any future picketing by any representatives or agents of Local 3 or its auspices, designating a business agent, officer, or representative to be in charge of the picketing, and assuring that he or she or a designated alternate shall be present at the picket line at all times to monitor and control the picket line activity."[12]

9. Paragraph 3(a) initially required Local 3 to purge its contempt by "[i]mmediately depositing $50,000 in an interest-bearing account in the registry of the United States Court for the Eastern District of New York as a fine to be remitted upon compliance with the steps enumerated below as 3(b), 3(g)-(j) and 3(p)."

10. Paragraph 3(d) initially read "Refraining them from threatening neutral employers with economic action in order to cause them to cease doing business with a primary employer; from picketing at entrances properly reserved for neutral persons; from picketing at times when the primary employer is not engaged at his normal business at job sites; from impeding ingress or egress at job sites; from engaging in mass picketing; from employing the tactic of group shopping or 'shopins'; and from utilizing symbols of labor unrest (including, but not limited to the inflatable rat balloon) in an effort to enmesh neutral employers and employees in Local 3's primary labor disputes."

11. Paragraph 3(m) initially read "At the outset of any future picketing by any representatives or agents of Local 3 or under its auspices, holding a meeting with all Local 3 officers, employees, representatives, agents, and pickets who will be participating in the picketing during which the participants shall be informed about the requirements of this adjudication and the Court's orders. Written instructions shall be distributed, read and discussed at the meeting, and all persons in attendance shall sign an acknowledgement that they have received the instructions and will abide by them. Such instructions and acknowledgements shall be retained at Local 3's office and shall be furnished to the Board's Regional Director or the Contempt Litigation and Compliance Branch within fifteen (15) days of any request thereof. No agent or member of Local 3 may participate in the picketing without having received such instructions and signing the aforementioned acknowledgement."

12. Paragraph 3(n) initially read "At the outset of any future picketing by any representatives or agents of Local 3 or under its auspices, designating a business agent, officer, or representative to be in charge of the picketing, and assuring that he or she or a designated alternate shall be present at the picket line at all times to monitor and control the picket line activity. The person in charge shall require

Paragraph 3(*o*) is deleted.[13]

Paragraph 4 is amended to read only "The Court, in order to assure against violation of its orders, impose an increased prospective fine against Local 3 of $25,000 per violation (i.e., for the first day at which unlawful secondary activity occurs at a particular location) and $5,000 for each day that any unlawful secondary activity continues to occur at that location." [14]

Adding a Paragraph 5, to read "The Court orders Local 3 to pay the costs and fees of the Special Master, totaling $35,798.76."

Renumbering the current Paragraph 5 as Paragraph 6.

each person participating in the picketing to sign a log sheet on a daily basis, which sheet shall be headed with the statement, 'You are reminded that, while picketing, you are required to abide by the terms of the contempt adjudication and written instructions which were previously given to you.' Within ten (10) days of a request by the Board's Regional Director or the Contempt Litigation and Compliance Branch, Local 3 shall furnish the logs showing the names of all pickets, the dates that each was present at the picket line, and the assigned time for picketing on that date, to the requesting Board representative."

13. This paragraph initially required Local 3 to purge its contempt by "[u]pon the filing of an unfair labor practice charge alleging acts which would constitute violations of this adjudication, or upon the institution of an investigation as to whether contumacious conduct had occurred, and upon the request of the Region or the Contempt Litigation and Compliance Branch, furnishing all evidence in Local 3's possession relating to those allegations, including a description of the alleged occurrences, the identity (names and business addresses) of persons with knowledge of the alleged occurrences, any documentary or photographic evidence concerning such occurrences, and any similar evidence concern-

ing affirmative defenses which Local 3 plans to raise to such allegations, said materials to be furnished in writing within fourteen (14) days of the request by the Region or the Contempt Litigation and Compliance Branch. Provided, that the Board may, in addition to this provision, also utilize its traditional authority under Section 11 of the National Labor Relations Act to issue subpoenas and conduct discovery as to whether compliance has been undertaken or to investigate any allegations of noncompliance."

14. This paragraph initially read, per the Special Master's Supplemental Recommendations with Respect to Remedies issued August 1, 2005, "The Court, in order to assure against violation of its orders, impose an increased prospective fine against Local 3 of $25,000 per violation (i.e., for the first day at which unlawful secondary activity occurs at a particular location) and $5,000 for each day that any unlawful secondary activity continues to occur at that location and impose prospective fines of $2,000 per violation and $200 for each day the violation continues on any Local 3 officer, employee, agent, representative, or any other person (including picketers) acting in concert or participation with Local 3 who, with knowledge of the 1996 Consent Order, violates same."