**UNITED TECHNOLOGIES COMMUNICATIONS COMPANY, Plaintiff,**

v.

**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL UNION NO. 3, Defendant.**

No. 81 Civ. 5911 (IBC).

United States District Court, S.D. New York.

Nov. 8, 1984.

Reboul, MacMurray, Hewitt, Maynard & Kristol, New York City by Stephen E. Tallent, New York City, William F. Highberger, Burton J, Fishman, and Gibson, Dunn & Crutcher, Washington, D.C. by Wayne A. Cross, David S. Elkind, New York City, for plaintiff.

Norman Rothfeld, New York City, for defendant.

## OPINION ON LIABILITY PHASE AFTER NON-JURY TRIAL

### IRVING BEN COOPER, District Judge.

This is a damage action against a local union under Section 303 of the National Labor Relations Act, as amended ("the Act") (29 U.S.C. § 187)[1] for injuries to plaintiff allegedly arising from defendant's violations of Section 8(b)(4) of the Act 29 U.S.C. § 158(b)(4).[2] It was bifurcated into a first phase non-jury trial on liability, now completed, and a second phase on damages, to be scheduled.[3] This opinion, which disposes of motions made during trial, contains the Court's findings of fact and con-

1. Section 303 of the Act, 29 U.S.C. § 187, provides:

(a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158(b)(4) of this title.

(b) Whoever shall be injured in his business or property by reason or (sic) any violation of subsection (a) of this section may sue therefor in any district court of the United States subject to the limitations and provisions of section 185 of this title without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit.

2. Section 8(b)(4) of the Act, 29 U.S.C. § 158, in relevant part, makes it an unfair labor practice for a union or its agents—

(4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

.    .    .    .    .

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;

.    .    .    .

(D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the Board determining the bargaining representative for employees performing such work.

3. This opinion deals solely with liability issues on plaintiff's damage claims under 29 U.S.C. § 187. Thus, it does not address, for example, the sources of law for, or law applicable to, computation of amounts of damages, the proof necessary to support the elements of compensatory damages or the availability of compensation for loss of use of funds prior to entry of judgment. These and other matters remain to be considered when trial resumes.

clusions of law as required under Rule 52 of the Federal Rules of Civil Procedure.[4]

### Jurisdiction and Parties

Defendant is Local 3, International Brotherhood of Electrical Workers, AFL–CIO (Local 3). It is an unincorporated association in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment or conditions of work. (Stipulation of Fact 1). Local 3's principal office is at 158–11 Jewel Avenue, Flushing, New York and it is engaged within this judicial district in transacting business and in promoting and protecting the interest of its employee-members. (Stipulation of Fact 2).

Plaintiff is United Technologies Communication Company ("UTCC"), a Delaware corporation. Since July 23, 1982, it has been engaged in the business of selling, installing and maintaining private telephone systems with premises located at 420 Lexington Avenue, Suite 540, New York, New York. UTCC, in the normal course of business operations, receives goods and products directly from suppliers located outside the State of New York valued annually in excess of $50,000. It is an employer engaged in commerce and in business affecting commerce within the meaning of § 2(1), (2), (6), and (7), § 8(b)(4), and

§ 303 of the National Labor Relations Act ("the Act"). (Stipulation of Fact 5).[5]

Plaintiff's technical employees, though not covered by Local 3, have union affiliation. It has collective bargaining agreements with Communication Workers of America, AFL–CIO (CWA), which are administered, insofar as they cover employees at their New York facilities in the classifications of installer technicians, communications technicians and senior communications technicians, by Local 1109. (Stipulation of Fact 10). Local 1109 is an organization in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment and conditions of work. (Stipulation of Fact 3). Its principal office is in Brooklyn, New York and it is engaged in this judicial district in transacting business and in promoting and protecting the interests of its employee-members. (Stipulation of Fact 4).

### The Complaint and Pre-Trial Order

■ Plaintiff's complaint sets forth two separate causes of action for damages. The first arises from allegedly illegal secondary boycotts in violation of § 8(b)(4)(B) of the Act, 29 U.S.C. § 158(b)(4)(B). The second is for allegedly illegal jurisdictional disputes in violation of § 8(b)(4)(D) of the Act, 29 U.S.C. § 158(b)(4)(D).[6] Under these causes, plaintiff must plead and prove de-

---

**4.** The defendant's motions to dismiss, made at the end of plaintiff's case, and renewed at the close of all evidence, are denied. The parties' motions on evidentiary issues, made at trial and preserved through post-trial memoranda, are disposed of as shown on Annex A. The trial record consists of over 1,050 pages of testimony by 16 witnesses and argument, and includes 70 exhibits marked in evidence or for identification. Where facts are found in the opinion, the present tense is used but the findings refer to the facts only at all material times unless the context otherwise indicates. Contentions and arguments of the parties, not specifically addressed herein, have been considered and, to the extent inconsistent herewith, are rejected.

**5.** UTCC acquired the assets of General Dynamics Communications Company (GDCC), the originally named plaintiff, on July 23, 1982, and

was substituted over defendant's objection as party plaintiff by an order dated September 22, 1982 entered by the Hon. Edward Weinfeld. Because many of the relevant events occurred prior to July 23, 1982, and the above statutory findings under Stipulation 5 apply to GDCC as well, we will refer to UTCC and GDCC interchangeably. Defendant has failed to show, in evidence or under law, why UTCC should not be treated as an assignee of GDCC's claims for which it gave consideration, or how labor law policies would be subverted by recognizing UTCC as the real party-in-interest entitled to recovery of GDCC's pre-July, 1982 damages. To the extent the UTCC acquisition may be shown to have mitigated damages, defendant is free at Phase II to evidence such mitigation.

**6.** See note 2, *supra*.

fendant's secondary boycott or jurisdictional objective *and* either that defendant induced or encouraged one or more individuals employed by any person engaged in commerce to engage in "a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services" (§ 8(b)(4)(*i*)), *or* "threaten[ed], coerce[d], or restrain[ed] any person engaged in commerce or in an industry affecting commerce" (§ 8(b)(4)(*ii*)).

More specifically, the essential allegations of the complaint state that:

(a) at one site, Two Broadway, New York City, the defendant "repeatedly interrupted [GDCC's] employees and prevented them from work" and "refused to continue work on their jobs if [GDCC] and its employees were permitted to continue installing a telephone system," and "have cut light cables, have caused temporary lighting to be cut off in the area of [GDCC's] work, and otherwise have harassed and threatened [GDCC]," (Complaint ¶¶ 10–15), resulting in damages of "approximately $30,000 by virtue of the delays and installation schedule disruptions caused by defendants." (Complaint ¶ 20).

(b) at a second site, One Broadway, New York City, the defendant "refused to continue work on the job if [GDCC's] subcontractor Triboro were permitted to continue installing the telephone system," and "cut electrical cables," as a result of which "the party with whom [GDCC] had contracted to install a telephone system cancelled the work," resulting in damages of approximately $100,000 (Complaint ¶¶ 16–20).

(c) GDCC further claimed damages of "a not yet determined loss of potential business" (Complaint ¶¶ 21 and 24).

(d) one purpose of defendant's conduct was to force employers and their employees to cease doing business with GDCC (Complaint ¶¶ 22 and 26).

(e) another purpose of defendant's conduct was to force GDCC to assign particular work to employees that Local 3 represents (Complaint ¶¶ 23 and 26).

Defendant's answer generally denies knowledge of and responsibility for the acts alleged in the complaint. and claims that plaintiff failed to state a claim upon which relief may be granted.

The pre-trial order, dated November 1, 1982, identifies, in addition to the two sites on Broadway, New York, ten potential customers in New York City by name as to which plaintiff claims damages for lost sales under the complaint (Complaint ¶¶ 21 and 24). Certain evidence as to them was adduced at trial over defendant's objection that plaintiff had failed to move for leave to amend its complaint, thereby depriving defendant of an opportunity to move to dismiss on the pleadings for lack of statutory jurisdiction and for failure to state a claim (Defendant's Post-Trial Memorandum, p. 3). Defendant's objection is rejected. It has neither claimed nor shown prejudice in discovery or in asserting legal defenses; the complaint had put it on notice that the damages sought included lost sales and were not limited to the Broadway sites; and plaintiff's discovery early addressed the claimed lost sales. In any event, plaintiff's complaint is deemed amended to conform to the proof at trial and any effort to show absence of statutory jurisdiction can be renewed at the phase II trial proceedings in this action.

In addressing the multiple contentions and factual issues raised by the parties, we will divide this opinion, after some background comments and findings, into six additional sections. The first two contain factual findings relating to the Broadway sites where GDCC had contracts to sell and install telephone equipment which were terminated or modified allegedly because of Local 3's unlawful actions. The third addresses collateral estoppel issues arising from prior decisions of the National Labor Relations Board (NLRB) which discussed these Broadway sites. The fourth turns to evidence of claimed lost sales to potential GDCC customers. The fifth contains discussion of legal issues and certain ultimate legal conclusions. The final section sets forth the Court's direction as to further proceedings in this action.

## Background

Plaintiff makes much of the long history of Local 3's conduct as shown by legislative materials,[7] administrative and judicial proceedings [8] and agency findings in recent administrative cases arising from facts at issue here,[9] all of which found Local 3 to be in violation of law. Indeed, as Judge Edward Weinfeld noted early in this case in an injunctive context (requiring only a finding of reasonable grounds to believe the facts alleged) concerning defendant's conduct at the One Broadway site at issue, there is evidence to show that "at different sites in the Metropolitan [New York] area where [workers of CWA, plaintiff's employees' union] were engaged in telephone installation work, respondent and its members pursued a persistent and recurrent pattern of conduct in the enforcement of its total job policy which resulted in strikes or stoppages and other conduct proscribed by the Act. [Citing Fed.R.Evid. § 404(b) and *U.S. v. Chestnut*, 533 F.2d 40, 49 (2d Cir.), *cert. denied*, 429 U.S. 829, 97 S.Ct. 88, 50 L.Ed.2d 93 (1976) ]." *Silverman v. Local 3, IBEW*, 110 LRRM 2242, 2245 (S.D.N.Y. 1981).

The "total job policy" finds expression in section 12 of Article XIII of the by-laws of Local 3 which are given to members of the Local (Pl. Trial Ex. 25, Sections 10 and 12, at 21):

"No member is to give away work coming under the jurisdiction of this Local, or to allow any other tradesmen to do work coming under this Local's jurisdiction."

**7.** Congress was aware of Local 3's strike and other tactics in enacting § 8(b)(4)(B). Its secondary boycott activities in the 1930s and early 1940s had been documented in *Allen Bradley Co. v. Local 3*, 41 F.Supp. 727 (S.D.N.Y.1941) (Special Master's report), *judgment entered on report of Special Master*, 51 F.Supp. 36 (S.D.N.Y.1943), *rev'd and action dismissed*, 145 F.2d 215 (2d Cir.1944), *dismissal rev'd and case remanded for modification and clarification of judgment and injunction*, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945), *injunction entered on remand aff'd with modifications*, 164 F.2d 71 (2d Cir.1947). The Report of Senator Taft's Senate Committee on Labor and Public Welfare noted that a provision now codified in § 8(b)(4)(B) was intended to reach such conduct, specifically referring to Local 3 and the Allen Bradley case:

This paragraph also makes it an unfair labor practice for a union to engage in the type of secondary boycott that has been conducted in New York City by Local No. 3 of the IBEW, whereby electricians have refused to install electrical products of manufacturers employing electricians who are members of some labor organizations other than Local 3 (See testimony of R.S. Edwards, ... ) *Allen Bradley Co. v. Local Union No. 3, I.B.E.W.*, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939.

S.Rep. No. 105, 80th Cong., 1st Sess. at 22 (1947), *reprinted in* 11 NLRB, *Legislative History of the Labor Management Relations Act, 1947*, at 428 (1948).

**8.** Local 3 has been embroiled in unfair labor practice claims from the public and private sector alike. Thus, administrative and judicial tribunals have repeatedly found acts and subterfuges by Local 3 and its members to violate §§ 8(b)(4)(B) and (D). See, for example, *Local No. 3, IBEW (L.M. Ericsson Telecommunications, Inc.), supra*, 257 NLRB 1358 (1981); *Local No. 3, IBEW (New York Electrical Contractors Ass'n, Inc.)*, 244 NLRB 357 (1979); *Local No. 3, IBEW (Eastern States Electrical Contractors, Inc.)*, 205 NLRB 270 (1973); *Local No. 3, IBEL (Wickham Contracting Co.)*, 220 NLRB 785 (1975), enf'd, 542 F.2d 860 (2d Cir.1976); *Local No. 3, IBEW (Mansfield Contracting Corp.)*, 205 NLRB 559 (1973); *Local No. 3, IBEW (Hylan Electric Co.)*, 204 NLRB 193 (1973), *Local No. 3, IBEW (Bisantz Electric Co.)*, 192 NLRB 283 (1971); *Local No. 3, IBEW (Atlas Reid, Inc.)*, 170 NLRB 584 (1968); *Local No. 3, IBEW (Picker X-Ray Corp.)*, 128 NLRB 561 (1960) (all § 8(b)(4)(B) cases); and *see, Local No. 3, IBEW (General Dynamics Communications Co.)*, 264 NLRB No. 27 (1982); *Local No. 3, IBEW (Northern Telecom, Inc.)*, 262 NLRB No. 184 (1982); *Local No. 3, IBEW (Teltronics Services, Inc.)*, 217 NLRB 834 (1975); *Local No. 3, IBEW (Mansfield Contracting Corp.)*, 206 NLRB 423 (1973); *Local No. 3, IBEW (Madison Square Garden Center, Inc.)*, 202 NLRB 722 (1973); *Local No. 3, IBEW (Hylan Electric Co.)*, 202 NLRB 544 (1973); *Local No. 3, IBEW (Mansfield Contracting Corp.)*, 201 NLRB 724 (1973); *Local No. 3, IBEW (Madison Square Garden Center, Inc.)*, 198 NLRB 380 (1972); *Local No. 3, IBEW (Western Union Telegraph Co.)*, 172 NLRB 1645 (1968); *Local No. 3, IBEW (Ladd Electric Corp.)*, 158 NLRB 410 (1966) (all § 8(b)(4)(D) cases). In New York, the City's Board of Education has had a particularly litigious record involving Local 3. See *Local 3, IBEW (Wickham Contracting Co.)*, 220 NLRB 785 (1975), enf'd, 542 F.2d 860 (2d Cir. 1976); *Wickham Contracting Co. v. Board of Education*, 715 F.2d 21 (2nd Cir.1983).

**9.** See notes 24–26.

In effect for many years (Stipulation of Fact 16), this by-law has been the subject of rulings by the National Labor Relations Board (the "Board") and Courts of Appeal, and has been specifically held by the Board to be an illegal inducement to strike in violation of § 8(b)(4)(i). *Local No. 3, IBEW (L.M. Ericsson Telecommunications, Inc.)*, 257 NLRB 1358 (1981) *enforced by consent order*, No. 82–4030 (2d Cir.1982). See *IBEW v. NLRB*, 341 U.S. 694, 701–02, 71 S.Ct. 954, 958–59, 95 L.Ed. 1299 (1951) ("The words 'induce or encourage' are broad enough to include in them every form of influence and persuasion."); *NLRB v. Local 3*, 730 F.2d 870 (2nd Cir. 1984); *Joliet Contractors Ass'n v. NLRB*, 202 F.2d 606, 611–12 (7th Cir.), *cert. denied*, 346 U.S. 824, 74 S.Ct. 40, 98 L.Ed. 349 (1953).[10]

In this context, defendant properly cautions that the Court should not find Local 3's proclivity for violation of .§ 8(b)(4) as evidence of liability in the damage action here. We agree that liability here is not,

nor should it be, predicated upon a history, even if extensive, of prior violations or the fact, alone, that the by-law continues to exist. See *Glasser v. NLRB*, 395 F.2d 401 (2nd Cir.1968). Aside from partial collateral estoppel discussed below, as to the One Broadway site, we nonetheless do find Local 3's prior conduct relevant and material in evaluating the specific evidence adduced at trial, including evidence as to the Broadway sites, practices in the New York Metropolitan area marketplace and the practical effects of that history in conditioning customers' perceptions of risks in securing non-Local 3 labor and products—factors to be evaluated with the total mix of circumstances which plainly affect plaintiff's business and business opportunities.[11]

## I.

### *Plaintiff's Contract With Fox Glynn & Melamed at One Broadway*

The following facts are not in dispute. On or about March 20, 1981, Fox Glynn &

---

**10.** This Circuit has long recognized that the by-law may properly buttress an agency funding of an "illegal inducement" violative of Section 8(b)(4)(i). See *NLRB v. Local 3*, 325 F.2d 561, 562 (2nd Cir.1963). At trial, defendant offered no evidence about the origin or maintenance of the by-law, its purpose, effect or operation, or the consideration, if any, given by Local 3 to amend, or delete, the by-law in view of unambiguous adverse administrative or judicial decisions addressing its practical significance or evidentiary effect. We infer that Local 3 could have taken action to change or explain the by-law to its members at all material times so that it would not serve in any way as an illegal inducement or encouragement to strike or enter into jurisdictional disputes, and that defendant's failure to evidence any such action is at least because it determined, for whatever reason, not to do so. See *NLRB v. Local 3*, 730 F.2d 870, 877 (2nd Cir.1984).

**11.** We note, for example, that defendant has argued that its workers are willing to work alongside of CWA-represented union members employed by New York Bell Telephone and, from this premise, seeks to negate any jurisdictional objective in the actions of its members affecting plaintiff's employees here, also CWA members. We are persuaded to reject defendant's argument. Based on the trial record, the more reasonable inference, and we so find, is only that Local 3 respects broad injunctions in favor of New York Bell Telephone (now NY-

NEX). See *Local No. 3, IBEW (New York Telephone Co.)*, 197 NLRB 328, *enf'd*, 477 F.2d 260 (2nd Cir.), *cert. denied*, 414 U.S. 1065, 94 S.Ct. 572, 38 L.Ed.2d 470 (1973); *Local 3, IBEW (New York Telephone Co.)*, 193 NLRB 758 (1971), *enf'd*, 467 F.2d 1158 (2nd Cir.1972). Moreover, New York Telephone and its affiliate Western Electric had previously prevailed over Local 3 in at least four other secondary boycott and jurisdictional dispute cases. *Local No. 3, IBEW (New York Telephone Co.)*, 197 NLRB 866 (1972); *Local No. 3, IBEW (New York Telephone Co.)*, 193 NLRB 765 (1971); *Local No. 3, IBEW (Western Electric Co.)*, 141 NLRB 888 and 144 NLRB 1318 (1963) *enf'd*, 339 F.2d 145 (2nd Cir.1964); *Local No. 3, IBEW (New York Telephone Co.)*, 140 NLRB 729, *enf'd*, 325 F.2d 561 (2nd Cir.1963). See also, Trial testimony of Michael Woodford (Transcript ("Tr.") 577), Anthony Orlando (Tr. 607–612) and Anthony Trapini (Tr. 740).

Whether § 8(b)(4) violations, where they caused injury, may be shown to· have resulted in reasonably calculable damages is, of course, a matter reserved for subsequent proceedings in this action. See *Wickham Contracting Co. v. Board of Education*, 715 F.2d 21, 26, 28–29 (2nd 1983) (applying collateral estoppel on liability to prevent Local 3 from denying, in a Section 303 action, prior findings of fact and law in an NLRB unfair labor practice proceeding but reversing a $959,000 damage award and granting a new trial on damages).

Melamed, a New York law partnership, contracted with GDCC for the installation of a telephone system at offices which Fox Glynn & Melamed leased on the sixth and seventh floors at a building being renovated and located at One Broadway, New York, New York.[12] Morse Diesel, Inc., the general contractor involved in the renovation of the building,[13] subcontracted the electrical work, sometime prior to June 1981, to Henry Paul, Inc., an electrical contractor using Local 3 labor in the construction industry.[14] GDCC, on or about June 26, 1981, subcontracted a portion of the telephone installation work to Triboro Telephone Planning and Interconnect, Inc. who used CWA labor.[15] (Stipulations of Fact 6–9, 12–13).

Fox Glynn & Melamed cancelled its contract with GDCC because of the alleged delays in installing the phone system and GDCC's alleged use of "incompatible labor." (Stipulation of Fact 27). The project for Fox Glynn & Melamed was completed by Telecom, a competitor of GDCC, whose technicians were members of Local 3 (Stipulation of Fact 28).[16]

**12.** Fox Glynn & Melamed is a person engaged in commerce within the meaning of § 2(1), (2), (6) and (7), and § 8(b)(4)(B) of the Act. (Stipulation of Fact 8).

**13.** Morse Diesel, Inc., herein called Morse Diesel, is a Maryland corporation with an office located at 1133 Avenue of the Americas, New York, New York and places of business located at various other locations in the State of New York, where it is engaged as a general contractor in the construction industry. Morse Diesel is a person engaged in commerce within the meaning of § 2(1), (2), (6) and (7) and § 8(b)(4)(B) of the Act. (Stipulation of Fact 6).

**14.** Henry Paul, Inc. ("Henry Paul"), is a New York corporation with an office at 69–44 Calamus Avenue, Queens, New York, where it is engaged as an electrical contractor in the construction industry. (Stipulation of Fact 7).

**15.** Triboro Telephone Planning and Interconnect, Inc. ("Triboro") is a New York corporation with an office at 151 East 25th Street, New York, New York, where it is engaged in the installation of telephone equipment and related services. (Stipulation of Fact 9).

**16.** Telecom was specifically asked whether it used Local 3 employees prior to its engagement

The precipitating events for the cancellation began on Tuesday, June 30, 1981, when James DiTusa, a Local 3 member and foreman for Henry Paul, Inc., with his apprentice (also represented by Local 3) absented themselves from the seventh floor for two days. "The motivating reason for Mr. DiTusa's not working on the sixth (sic) floor was the fact that non-Local 3 personnel had performed work to install a telephone system which DiTusa felt should have been performed by themselves." UTCC and its subcontractor Triboro were requested by the customer to stay away from the job site because the electricians would not work alongside them. (Stipulation of Fact 24).[17]

The following day, on July 1, 1981, Morse Diesel, the general contractor at One Broadway, informed Muna Realty, Fox Glynn & Melamed's landlord, by telex that a work stoppage had occurred on the seventh floor at One Broadway because "Fox Glynn & Melamed has employed a non-Local 3 approved telephone installer from

by Fox Glynn & Melmamed. (Tr. 132–3). Local 3 was neither certified by the National Labor Relations Board ("Board") as the collective-bargaining representative of any of the employees assigned by GDCC under its contract with Fox Glynn & Melamed nor had the Board issued any order determining that Local 3 is the bargaining representative of the employees assigned to perform said work. Moreover, at no material time was Local 3 engaged in a labor dispute with Morse Diesel, Morse Diesel's electrical subcontractor (Henry Paul), Morse Diesel's customer (Fox Glynn & Melamed) or Fox Glynn & Melamed's landlord (Muna Realty). (Stipulations of Fact 14 and 15).

**17.** GDCC's installation of multi-floor telephone systems generally involves a location survey, assembly of necessary materials, pulling telephone cables, and construction of private automatic branch exchanges to connect outside lines to individual cables leading to telephone instruments placed at the site. Access electrical work is generally provided by electricians, often Local 3 employees, so that station cable can be fed through electrical closets and into floor risers. Thereafter, larger riser cables are generally pulled by GDCC to the switchroom from any floor where telephone stations are located. The branch exchange would then be connected and tested.

General Dynamics to perform work on the seventh floor." The telex, which defendant stipulates was sent, but not that it was accurate, had instructed Muna to "advise" its tenant. (Stipulation of Fact 25). Fox Glynn & Melamed was concerned because its lease had a "harmonious labor" clause. (Tr. 110).

Approximately one week later, on July 9, 1981, GDCC met with Fox Glynn & Melamed to determine what steps could be undertaken to recommence the telephone installation work; during this meeting, a close examination of the status of the project was made (Stipulation of Fact 26). Shortly thereafter, GDCC's contract was terminated. (Tr. 67, 79).

These facts in place, the parties disagree both as to their import and other matters concerning the events leading to the termination of the contract as shown by testimony at trial.

In view of our finding below that Local 3 is collaterally estopped from denying liability with respect to its conduct at One Broadway, we do not discuss all material aspects of the evidence in the record which, alternatively and independently, we find supports a finding of liability under Section 8(b)(4)(B) as to this site.[18]

The credible testimony, beyond the stipulated facts, however, shows that, prior to cancelling plaintiff's contract, Fox Glynn & Melamed were informed or observed and believed that:

(a) James diTusa, Local 3's electrician foreman, complained that unauthorized labor, referring to GDCC, "not local approved," referring to Local 3, was pulling telephone cables on the seventh floor at One Broadway and, for that reason, walked off the job (Tr. 102, 121, 123).

(b) Temporary lights were out in the seventh floor work area on June 30, 1981 where no electricians were working and GDCC employees were pulling cable (Tr. 124).

(c) Local 3 personnel would not return to the seventh floor while non-Local 3 personnel were doing the GDCC job, (Tr. 124) and thus Fox Glynn & Melamed, to avoid delay in electrical work, asked plaintiff on July 1 not to send their non-Local 3 employees to pull more telephone cables. Fox Glynn & Melamed then thought the schedule for completing telephone installation could still be met. (Tr. 128).

(d) Merrill, Lynch was having a problem concerning use of non-Local 3 labor, as of June 28, 1981, at space across the street from Fox Glynn & Melamed where GDCC was installing a private telephone system. (Tr. 53).

(e) About 30 telephone cables found cut on the seventh floor at One Broadway on July 9, 1981, jeopardized GDCC's meeting of the rescheduled August 14, 1981 installation date (Tr. 71). Fox Glynn & Melamed treated the contract with GDCC as breached and terminated it. (Tr. 131–2).

Plaintiff's Operations Supervisor at One Broadway, Peter Sarni, testified that he called the police on July 9 to report that the seventh floor telephone cable was cut, which Sarni's testimony convinces us it was, but the record is devoid of credible evidence as to whether the police responded, what investigation, if any, was conducted, and what, if anything, eventuated from any investigation.

Further, there is no direct evidence that any officer or business agent of Local 3, prior to July 10, 1981, was advised specifically of what problems existed concerning GDCC's work at One Broadway.[19] Plain-

---

**18.** We accept as true the notation in Morse Diesel's July 1 work log for One Broadway that "electricians refused to work on 7th floor because of tenant's telephone installer." (Pl. Exh. 9). We reject the sufficiency, even if true, of the testimony of Local 3's business agent, Mr. Rosenberg, as to what he would have done if he had known in early July that diTusa and others walked off the job (Tr. 1044).

**19.** See Pl.Exs. 39, 40, 47, 49. An NLRB complaint was filed July 1, 1981 (withdrawn without prejudice by letter mailed July 14, 1981) by Triboro Telephone Planning and Interconnect, Inc. charging coercion by Local 3 to force it to stop doing business with GDCC and Fox Glynn & Melamed. It was mailed by the NLRB Re-

tiff did, however, notify defendant's counsel, trial counsel in this action who did not testify, on June 30, 1981, by telephone of a walkoff by Local 3 from the job at "One or Two Broadway" involving Morse Diesel. We infer from the circumstances and content of the discussions that defendant was "on notice" in fact on June 30, 1981. (Tr. 510, 512–4.) Defendant's reliance on plaintiff's failure to send a confirmatory letter, clearly a step which foresight should have prompted, does not lead us to conclude that Local 3 was not "on notice" of the stoppage at One Broadway, or its circumstances, by June 30, 1981 or that notice to counsel under the circumstances here was not sufficient notice to Local 3.

## II.

### Modification of Plaintiff's Contract With Merrill, Lynch at Two Broadway

The following facts, which are background to an October, 1981 adverse modification of plaintiff's contract with Merrill Lynch, Pierce, Fenner & Smith ("Merrill, Lynch") at Two Broadway, appear without dispute.

In late 1980, Merrill, Lynch had entered into a contract with GDCC for the installation of a private telephone system to service offices on the 22nd and 23rd floors of an office building at Two Broadway, New York, New York. This space was being renovated prior to occupancy by Merrill, Lynch, and electrical work was to be performed by electricians who were members of, or represented by, Local 3. (Stipulation of Fact 18).

Prior to commencing work on the telephone installation for the 22nd and 23rd floor offices, GDCC sought to resolve any possible labor problems. (Stipulation of Fact 19).

On March 11, 1981, GDCC filed two charges with the Board in Case No. 2–CD–634 and in Case No. 2–CB–8744. After a Notice of Hearing had been issued by the Board on GDCC's charges, Local 3, through its counsel Norman Rothfeld, filed

a disclaimer of "any interest in the work described in the Notice of 10(k) Hearing." Both cases were thereupon closed. (Stipulation of Fact 20).

In late May, 1981, Merrill, Lynch requested GDCC to install 35 telephones in temporary quarters in the basement of the building at Two Broadway. On June 2, 1981, when GDCC began to actually install the telephones in the basement, electricians who are members of, or represented by, Local 3 challenged GDCC's right to do the work and, shortly thereafter, New York Maintenance Foreman Squillante (a Local 3 member) objected to GDCC's performance of the work. (Stipulation of Fact 21).

On June 2, 1981, GDCC filed two charges with the Board, Case No. 2–CC–1710 and Case No. 2–CD–641. Local 3, again through its counsel Norman Rothfeld, filed a disclaimer of "any interest" in the installation of the "Private Automatic Branch Exchange." Thereupon, the charges were withdrawn. (Stipulation of Fact 22).

Merrill, Lynch contracted with GDCC to install additional telephones in offices being renovated at Two Broadway, this project being for the second and third floors. This is the agreement with respect to which plaintiff seeks damages in this action. The project included details of work which GDCC had *not* done in connection with the installation on the 22nd and 23rd floors. Indeed, prior to the time work started on the second and third floor project, New York Maintenance Superintendent Melandro (a Local 3 member) advised Anthony Orlando, of Merrill, Lynch's Locations Department, that Local 3 would have to do certain other work related to the telephone installation. (Stipulation of Fact 23).

While GDCC was performing its installation on the third floor, during August, September and early October, 1981, the electrical contractor was unable to meet Merrill, Lynch's schedules for the accomplishment of electrical work related to the renovation of the second and third floors; the electri-

gional office on July 6, 1981 and received by Local 3 at its principal offices on July 10, 1981.

cal contractor was also unable to obtain the desired number of skilled electrical workers from the hiring hall of the Joint Industry Board of Electrical Industry. (Stipulation of Fact 31).

In an attempt, among others, to speed up the project, Michael Woodford of Merrill, Lynch met with Thomas Van Arsdale, Business Manager of Local 3, in October, 1981. In response to Mr. Woodford's mention of his inability to get sufficient electrical labor on the job and the existence of "some kind of a dispute between CWA and New York Maintenance," Mr. Van Arsdale said "in no uncertain terms" that "everybody gets an equal break on getting manpower" and "spent a fairly significant amount of time talking to me [Woodford] about the past relationships between Communications Workers and Local 3, giving me some background, I would think, establishing his side of a long relationship, whatever that might have been." (Stipulation of Fact 32). We draw no inferences from the substance of this conversation.

On October 28, 1981, Merrill, Lynch reopened construction on the second and third floors of Two Broadway only after requesting GDCC to give up all the work which had been contracted to it for performance by GDCC on the second and third floors, save for the final installation task of physically plugging in the phones to jacks installed by Local 3 employees of New York Maintenance. Under this assignment of work, Local 3 electricians obtained more work on the second and third floors than the details of work they had done earlier in the year on the 22nd and 23rd floors. At the time the work was in fact reassigned, GDCC had completed only some of the work on the third floor; work on the second floor had not begun. (Stipulation of Fact 33).

The contract modification concerning the second and third floors, which defendant argues was voluntary, resulted in GDCC's agreeing to reduce the contract price by $151,460. (Stipulation of Fact 34).

At trial, except for defendant's business representative who, by his own testimony, purported to have no personal knowledge of any problem at Two Broadway until after September 21, 1981, defendant called no witnesses. Plaintiff called five witnesses who addressed the events at this site: John Egan, a CWA technician who came on site at Two Broadway in February 1981 and remained there until June, 1982, when he became an Operations Supervisor; Douglas Pew, GDCC's Vice President, Counsel and Secretary; David Perez, GDCC's in house labor counsel, Anthony Orlando, the Merrill, Lynch project manager at Two Broadway and Michael Woodford, the Merrill, Lynch Manager of Headquarters Facilities.

John Egan's direct testimony the court finds to be credible. Upon his arrival on February 20, 1981 at Merrill, Lynch's Two Broadway site, Egan's GDCC Supervisor, Peter Russo, introduced him to Mr. Melandro who was employed as a supervisor of New York Maintenance, the electrical subcontractor, who in turn introduced him to Mr. Louis Squillante and a Mr. Tobia, foremen who worked under Mr. Melandro. (Tr. 294).

In their very first meeting, Melandro challenged Egan with the declaration that the electricians, Local 3 labor, would run the telephone cables for GDCC. (Tr. 297).

Shortly thereafter, on March 1, 1981, Egan was introduced to Mr. Dennis Ragucci, the Local 3 Shop Steward who told Egan "that [he] was working for a scab company that paid nonunion wages, and he told [Egan] that if [Egan] was smart, [Egan] should join Local 3." (Tr. 299).

On March 6, 1981, Melandro told Egan that he "had to go and answer questions about what [GDCC] is doing here in the building..." before the executive board of Local 3 who were "getting nervous" about the work that GDCC was doing and that "[t]hey want to keep close tabs on what goes on down here." (Tr. 300). The Court finds that this and related testimony about Mr. Melandro's command appearances and communications with the executive board of Local 3, of which Local Mr. Melandro was a member, is a crucial, direct link in

establishing, as we find it does, the knowledge of Local 3 and its inducement, encouragement and support of events that followed at the Two Broadway site. The Court, therefore, rejects defendant's contention that Melandro should be treated merely as an employee of New York Maintenance whose statements and actions do not bear on the knowledge or liability of Local 3.[20]

On March 7, 1981, Mr. Squillante and Mr. Melandro insisted that GDCC "have an electrician ... on a one-to-one basis" along with the GDCC employees who were installing the telephone switch to serve Merrill, Lynch's offices on the 22nd and 23rd floors. (Tr. 307). When Egan said, in reply, that the telephone switch was his job, and not an electrician's job, and that he would not have an electrician working on the switch with him, Ragucci, who had joined the conversation, said

> "GD IS HANDS OFF, LOCAL 3 IS HANDS ON. WE WILL DO THE PHYSICAL WORK. YOU WILL NOT TOUCH THE SWITCH." [TR. 307].

Not content, Ragucci added "We don't want to get physical. This is our job. GD, hands off." (Tr. 309) GDCC employees stopped work (Tr. 309).

Two days later, on March 9, 1981, Melandro made another appearance before the executive board of Local 3. As stated later that day to Egan, the "... union feels that all the telephone work here is Local 3 work." (Tr. 319).

Work on the switch on the first floor gave rise to another incident on March 11, 1981. When Ragucci noticed that GDCC employees were putting cables into the back of the switch equipment there, Melandro was summoned. He advised Peter Russo, Egan's boss, that GDCC was not supposed to touch the switch. Melandro asserted that a prior "agreement" concerning the division of work between CWA and Local 3 "isn't valid any more..." (Tr. 325) and said that he, Melandro, would so advise Merrill, Lynch (Tr. 325).

On the morning of March 11, Melandro saw Egan and asked if he had seen "four guys" who "[t]he union sent ... to make sure no one works on the switch." Melandro emphasized "They're mean. You don't want to mess with them." Shortly after, Ragucci saw Egan and asked if he had seen the four guys who "[t]he union sent.... They're mean. They'll break your leg as well as look at you." (Tr. 327–328).

Still later in the afternoon on March 11, Mr. Squillante appeared at the first floor switch room and told Egan that Melandro was at the executive board of Local 3 and that "They want to know why you guys went to work on the switch again today." (Tr. 329) These comments were against a background where Egan, shortly after March 1, 1981, had been told by Ragucci that CWA was a scab union which "we don't recognize.... Your union doesn't exist, as far as we're concerned."

Additional events evidence on-going threats and coercion by members of Local 3 at Two Broadway. Towards the end of April or early May, Egan had overheard Ragucci speaking to a man whom he later was told was Charles Albanese, a Local 3 shop steward, from the opposite side of the telephone computer console near the first floor switch. Although only five feet away, Egan had not yet been noticed when he heard Ragucci, in effect, explain to Albanese how to sabotage the switch. "Yeah," said Ragucci, "we pull out one of these circuit cards, it's worth $10,000. Pull it out, the switch is down and you have to wait to get another one." (Tr. 333). We reject the arguments of Local 3 that Egan's physical proximity to this conversation without being noticed makes his testimony incredible.

---

**20.** Indeed, even if only a member of Local 3, Mr. Melandro was charged with knowledge of Section 12 of the Local's by-laws ("the total work policy"). Moreover, Melandro, who periodically was summoned by, and reported to, Local 3's executive board, and transmitted to GDCC the positions and action the Local was taking, admitted to Egan that the "union was getting down on him because [GDCC employees] were doing work ..." at Two Broadway.

Toward the end of May, Merrill, Lynch asked Egan to examine the basement of Two Broadway to see if phone service could be placed there by GDCC or New York Telephone. When Local 3 members learned that GDCC was asked to do the work on the basement facility, there was a confrontation on June 2 between seven or eight electricians and two or three GDCC technicians before Albanese told his workers to "cool it" (Tr. 340–341) and Russo and Perez, who had witnessed the events, told GDCC employees leave the area.[21]

The following day, on June 3, Squillante told Egan that the Local 3 employees had walked off the job the day before. Egan investigated and saw no electricians working. (Tr. 344–345).

**21.** Melandro had told Egan: "[I]f GD does the phone work for Merrill Lynch, then Merrill Lynch will have no electricity down there. The electricians will not do any electrical work." (Tr. 336). See Stipulation of Fact 21. The menacing events in the basement led to the filing of charges with the NLRB regarding the incident, as to which defendant filed a disclaimer of interest (Stipulation of Fact 22). However, GDCC did no further work in the basement at Two Broadway (Tr. 342). Local 3's repeated actions cannot be exonerated by later disclaimers which, as it urged at trial, evidence its lack of involvement in those incidents.
Defendant has argued that GDCC employees were ordered to leave the basement to avoid being convinced to quit GDCC and join Local 3. We find no credible support for and thus do not adopt this conjecture. Moreover, only two GDCC employees at Two Broadway left GDCC in 1981. One was Steven Due, who went to Local 3. What happened is poignantly recorded in the trial record:
Q. Do you know the reasons why Steve Due quit General Dynamics and went to Local 3?
THE COURT: Do you know?
A. Yes, I do.
Q. Would you tell us as fully as you can what you know in that regard, and what your basis for your knowledge is?
A. The basis for my knowledge is Mr. Due, himself. What he told me was that *when we were getting close to going to the administrative law judge with the NLRB, Mr. Due was going to be a witness for General Dynamics.* Mr. Due's brother works for Local 3. *Mr. Due started to receive phone calls at home from unnamed people threatening Mr. Due and his wife, and also stating that Mr. Due's brother was going to be in danger because something might fall on his head while he was at work.*

In August, 1981, the GDCC employees were installing cables for the second and third floors. They were beset by a variety of problems. Though defendant contends that these problems were not connected in the trial record with Local 3, the Court finds from the testimony and the reasonable and natural inferences to be drawn therefrom precisely to the contrary. Similarly, although Egan admitted on cross-examination that certain affidavits prepared by him in connection with proceedings before the NLRB did not make reference to several of these specific events, as they clearly did not, the Court does not infer therefore that the events did not occur. Egan's testimony as to his recollection was certain, unshakeable and impressive. The chilling events to which he testified as oc-

MR. ROTHFELD: Move to strike this hearsay once removed.
THE COURT: Is that what Mr. Due said to you?
THE WITNESS: Yes.
THE COURT: Motion is denied. Counsel for the defense opened up that field, himself. Next question.
Q. Did you learn anything more? Did Mr. Due say anything more than what you just testified to in regard to his change of employment?
A. Yes. One day Saturday when we had to work very late to build up directions for the electricians on [floors] two and three, he received a phone call at work, and we had planned to work to eleven o'clock that Saturday night. When Mr. Due turned around, even while he was on the phone, turned to me and said, "I have to go home right now."
I asked him if he wanted my car, if it was an emergency. He said, "No, I have to leave."
Monday morning, I asked him what was the problem. *He told me that his wife had received two calls, and one said Steve was working with the wrong people, he ought to smarten up and change his job.* And shortly after that, he stopped coming to work.
That's it.
(Tr. 473–74) (emphasis added)
As for Mr. Rennie, the second GDCC employee to join Local 3, Egan testified that Rennie thereafter returned to GDCC's employ and personally told him that his reason for returning was "that he couldn't stand working with mutts, and that he wanted to do a job that he needed his brain on, or he could use his brain on. I'm sorry, that was the quote." (Tr. 475).

curring during the first three weeks in August included:

(a) Once, and on most days twice, temporary lighting in the areas where CWA employees were working went out. Blackouts followed CWA employees about the work site. On one occasion, after complaint, the lights came back on a half hour or possibly an hour later (Tr. 351–355);

(b) Locks to the telephone room doors were filled with super glue (Tr. 356);

(c) Nails, screws and staples, on one occasion, were found in a conduit recently installed by electricians which would have been used to pull cable for the telephone by CWA employees of GDCC (Tr. 356–9);

(d) Installation of a telephone cable was delayed because a cable rack installed by Local 3 electricians collapsed;

(e) GDCC telephone cable, including at least six station cables were cut although nearby electrical cable was untouched (Tr. 356–361, 481);

(f) A GDCC employee's work shoes were filled with oil;

(g) GDCC's log book kept by Egan with respect to work disappeared (Tr. 374–375);

(h) Squillante accused CWA workers of doing things that were "unsafe" (Tr. 375);

(i) On August 12, 1981, Charlie, a Local 3 employee who appeared "frightened" to tell Egan, said that several electricians were "walking off the job" and had asked Charlie to "join them" (Tr. 363–369).

In addition to the foregoing, during early August, Egan testified that there was graffiti disparaging of CWA on walls of the telephone rooms on the third floor and also painted on two GDCC ladders. He further testified that some tools of GDCC was missing and, on one occasion, a pile of human excrement was found outside the telephone room door (Tr. 376–381).

With respect to each of the foregoing acts, events and conditions to which Egan testified, defendant moved to strike, pre-

dominately on the ground that, even if they had occurred, there was nothing in the record to show that glue in the telephone room doors, the nails, screws and staples in the recently placed conduits, the defect in the cable rack, the incisions in GDCC cables, the disparaging graffiti and the human excrement was incited, encouraged, instigated or accomplished by any member of Local 3 or attributable to any act of an officer, business representative or other authorized person of the Local. In the absence of any other explanation for the source of this focussed, consistent and disgusting harrassment, directed solely to CWA work areas and workers, the open and direct threats and animosity previously and contemporaneously expressed by Local 3 members to CWA members, and the "close tabs" the executive board of Local 3 had kept since early March on the job site, the inference is ineluctable that those actions were not done without the prior knowledge and support, if not direct incitement and encouragement, of Local 3's agents and executive Board.

Indeed, the pressure from Local 3 members directly on GDCC employees was but a part of the circumstances affecting Merrill, Lynch. It also is undisputed that the electrical contractor whose Local 3 employees "had given up work" to GDCC earlier on the 22nd and 23rd floors at Two Broadway lacked the ability to draw sufficient Local 3 workers from the Local 3 hiring hall to meet Merrill, Lynch's completion schedules (Stipulation of Facts 31; Tr. 570–73). To show how serious Merrill, Lynch regarded the problem, Michael Woodford arranged to meet, and met, Local 3's chief executive officer, Thomas Van Arsdale (Tr. 576). Thereafter, Douglas Pew, GDCC's counsel, was asked by Merrill, Lynch to give up portions of the project that GDCC had been awarded so it could be recontracted (Tr. 900–03).

Despite defendant's efforts to explain Mr. Pew's testimony as evidencing plaintiff's giving up work "voluntarily" as precluding a finding of causation on the issue of damages, the record is abundantly clear

that, as a practical matter, Merrill, Lynch, not GDCC, made the decision to reaward the work to break the log jam of delays arising, directly and indirectly, from Local 3's jurisdictional harrassment and stoppages (Tr. 908–910, 924–926). Ultimately, on October 20, 1981, Merrill, Lynch announced the change in the assignment of telephone cabling and switchboard wiring, effective October 28, 1981 (Tr. 382–3, 912–14).[22]

### III.

#### Collateral Estoppel

Plaintiff argues that the NLRB decision in *Local 3 v. General Dynamics Communications Company*, 264 NLRB No. 96 (1982) ("the NLRB decision"), enforced by the Court of Appeals for the Second Circuit,[23] precludes defendant from relitigating the material issues of fact and law as to its liability to plaintiff with respect to the matters in suit at One Broadway or Two Broadway. Defendant contends that no estoppel should apply, both under general legal principles and because this Court undertook to hear and review the testimony *de novo*.

In the NLRB decision, the panel affirmed findings of an Administrative Law Judge, after its independent review, that Local 3 violated Section 8(b)(4)(i) and (ii)(B) by causing a work stoppage by its member electricians employed by Henry Paul, Inc., between June 30 and July 2, 1981, at Fox, Glynn & Melamed's 6th and 7th floor offices at One Broadway with an object of forcing Fox, Glynn & Melamed to cease doing business with GDCC and its subcontractor Triboro. More specifically, it affirmed findings, after a detailed review of

the evidentiary record in the administrative proceedings, among others, that:[24]

1. DiTusa, operating as an agent of Local 3, instigated a work stoppage of Henry Paul's employees because CWA was involved in pulling telephone cable and Local 3 would not work alongside CWA employees doing things "designated as our work."

2. DiTusa, a Local 3 member acting as job foreman, was enforcing Local 3's total job policy, and his statements in carrying out such policy were binding on the Local.

3. Local 3's counsel was informed of the work stoppage on June 30, 1981.

In the course of deciding the charge as to violation of Section 8(b)(4) as to One Broadway, the Administrative Law Judge made specific findings as to the Merrill, Lynch site at Two Broadway. After review of the testimony, he concluded:[25]

"I find that on several occasions the New York Maintenance foreman and the Local 3 steward told GDCC employees that pulling cable was Local 3 work and that GDCC employees were not to do it. In addition, on one occasion, the GDCC employees were threatened with physical violence. I further find that New York Maintenance was in charge of the lights and that during the month of August lights were frequently out in the areas where GDCC employees were working. Finally, I find that Merrill, Lynch took the work away from GDCC and assigned it to New York Maintenance, partly because of the jurisdictional dispute."

**22.** Defendant's effort to impeach Pew by establishing the absence of his making contemporary notes of matters to which he testified from recollection initially raised some doubts about the weight to be given his testimony but, on reflection, was unconvincing. Indeed, cross-examination elicited that he twice told Merrill Lynch that if had to choose between giving up all the work and only part at Two Broadway, he'd prefer to give up part only. (Tr. 900–902, 931).

**23.** The NLRB decision was enforced by an unreported order of the Court of Appeals for the Second Circuit filed June 17, 1983 (Order 83–4017) (approving the NLRB's application of the law of agency, and consideration of the defendant's by-laws with other evidence of union responsibility, on the NLRB record).

**24.** Case 2–CC–1734, ALJ Dec. slip op. at 8 (Pl. Ex. 14).

**25.** *Id.* at 7.

The NLRB panel, in the course of its opinion, specifically noted that:[26]

> We also have held that evidence of a pattern of unlawful secondary harassment of a primary employer, *as has been demonstrated here in Respondent's [Local 3's] actions against GDCC at ... Two Broadway, constitutes evidence of Respondent's inducement or encouragement of subsequent secondary activity against the employer.* (citations omitted) (emphasis added).

Seizing upon this comment, plaintiff seeks to have us find the administrative record conclusive with respect to Two Broadway, as well as to One Broadway, and under Section 8(b)(4)(D) as well as 8(b)(4)(B). For reasons set forth below, we decline plaintiff's invitation and hold only, as an independent ground of decision, that the NLRB proceeding is conclusive as to the material facts and ultimate legal conclusions on the Section 8(b)(4)(B) violations at One Broadway.

The starting point in this Circuit as to the law of the applicability of collateral estoppel in a Section 303 action is *Wickham Contracting Co., Inc. v. The Board of Education,* 715 F.2d 21 (2d Cir.1983) in which Local 3's liability for a Section 303 violation was sustained, although the damage award was remanded for retrial. There, a panel unanimous on the applicable principles, said (at 26):

> "... [it] is now settled that administrative proceedings can have a preclusive effect in the form of either *res judicata* or collateral estoppel. As the Supreme Court has noted:
>
> > When an administrative agency is acting in a judicial capacity and resolved disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply *res judicata* to enforce repose.
>
> *United States v. Utah Construction Co.,* 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966). Following this general rule, a number of circuits have held that prior N.L.R.B. unfair la-

bor practice determinations can be binding as to fact and law under the doctrine of collateral estoppel in subsequent section 303 damage actions. See, *e.g., Consolidated Express, Inc. v. New York Shipping Association, Inc.,* 602 F.2d 494 (3rd Cir.1979), *vacated on other grounds,* 448 U.S. 902, 100 S.Ct. 3040, 65 L.Ed.2d 1131 (1980); *International Wire v. Local 38, International Brotherhood of Electrical Workers,* 475 F.2d 1078 (6th Cir.1973), *cert. denied,* 414 U.S. 867, 94 S.Ct. 63, 38 L.Ed.2d 86 (1973); *Texaco, Inc. v. Operative Plasterers & Cement Masons,* 472 F.2d 594 (5th Cir.1973), *cert. denied,* 414 U.S. 1091, 94 S.Ct. 721, 38 L.Ed.2d 548 (1973). While a prior decision of this court suggests otherwise, *Old Dutch Farms, Inc. v. Milk Drivers & Dairy Employees Union,* 359 F.2d 598 (2nd Cir.1966), *cert. denied,* 385 U.S. 832, 87 S.Ct. 71, 17 L.Ed.2d 67 (1966), that decision was rendered before *Utah Construction,* which, we believe, is fully applicable here.

> The legal and factual issues in the administrative and judicial proceedings are, but for damages, absolutely identical since section 303 authorizes damage actions for violations of section 8(b)(4), the very issue of liability adjudicated by the Board. So long as particularized unfairness is not demonstrated, we perceive no reason to allow a union or employer who has lost an 8(b)(4) unfair labor practice proceeding before the Board to relitigate issues relating to liability. Since there is no reason to believe that legal results in section 303 actions will be superior to those arrived at in the administrative proceedings, or that inconsistent results before the different tribunals will increase procedural or substantive fairness, the judicial and other resources consumed in relitigating such issues is pure waste."

See also, *Spancrete Northeast v. International Ass'n,* 514 F.Supp. 326, 331 (N.D.N.Y.1981), *aff'd without op.,* 679 F.2d 874

**26.** 264 NLRB No. 96, slip op. at 4 (Pl.Ex. 14).

(2nd Cir.1981) (where both claimant and the defendant Local contended that the facts found by the NLRB should not be relitigated in the Section 303 action).

■■■ Despite the policy considerations expressly underlying the *Wickham* formulation, this Court is reluctant to exercise its discretion to foreclose litigation under the evidentiary rules in court proceedings on factual matters addressed in the NLRB proceeding where those matters were not necessary to the outcome of that proceeding. See *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1979). Here, we note that the complaint in the NLRB proceeding did not charge a violation of Section 8(b)(4)(D) or a violation at Two Broadway. Moreover, counsel for Local 3 asserts (albeit without a particularized showing) that he was surprised by, and thus unprepared to rebut or seek a continuance as to, the evidence received in the proceeding as to Two Broadway. Further, the NLRB panel adopted the findings as to Two Broadway as one of a number of circumstances justifying its ultimate conclusions and order. Indeed, we read the NLRB opinion as relying primarily on other factors and believe its result, in any event, would not have been different even without the findings as to Two Broadway. Thus, we conclude that those findings were not "necessary" to the outcome before the NLRB, however relevant and corroborative they may have been. We, therefore, conducted our own hearing and, without regard to the findings by the NLRB, reached our independent determination on the record before us.[27]

## IV.

### Claimed Lost Sales To Potential Customers

Plaintiff has adduced evidence, some of it hearsay admitted for limited purposes, that potential customers or their telephone consultants rejected GDCC's proposals, or did not solicit proposals from GDCC, because of a fear that GDCC's non-Local 3 affiliation would lead to delay or injury, or risk breach of leasehold restrictions, if GDCC were selected to install its own or other telephone equipment. Aside from claimed, but unevidenced, unspecified and unknown potential customers, eight specified projects for identified potential customers which GDCC did not secure were the subject of extensive testimony.[28]

■■■ We have reviewed the record carefully. While it indisputably reflects that

---

27. We do not, in the exercise of discretion, give collateral estoppel effect to 264 NLRB No. 27 decided September 30, 1982, a Section 10(K) proceeding in which the NLRB only found that it had reasonable cause to believe that Local 3 had violated Section 8(b)(4)(D) at One Broadway. We find, independently on the record before us, that Local 3 is liable under this Section. Moreover, although the NLRB denied UTCC's motion to be substituted for GDCC as charging party for purposes of granting injunctive relief in 264 NLRB No. 27 and 264 NLRB No. 96, we do not find that ruling binding here in UTCC's damage action under § 303.

28. Plaintiff asks for a finding that it lost these opportunities because of "Local 3's conduct and its history of violating § 8(b)(4)." Plaintiff's Proposed Findings of Fact 74–83. Because (1) no specific contemporaneous conduct of Local 3 with respect to these opportunities, other than the maintenance of its "total job" by-law and the impact of the pervasive history of its prior similar conduct is in evidence, (2) plaintiff's main witnesses and documents were self-serving, uncertain and impeached on cross-examination, and (3) other business factors admittedly affecting the risk of business loss were not persuasively negated, compare *Mead v. Retail Clerks Int'l Assoc.*, Local 839, 523 F.2d 1371, 1377 (9th Cir. 1975), we reject plaintiff's contentions. Further, we are mindful that plaintiff advised that Court that it had not presented certain testimony, particularly concerning factors not involving Local 3, that were at work in the New York marketplace that go to the question of damages. (Tr. 981). We assume, therefore, that none of the proposed further evidence at Phase II would supply the missing causal link between lost sales and specific conduct of Local 3 in respect of these opportunities, much less evidence of violations of Section 8(b)(4). Compare, *NLRB v. Local 3*, 730 F.2d 870, 877 (2nd Cir.1984) (Local 3's proclivities held proper background evidence concerning prior similar unlawful activity used for evaluating Local 3's conduct and for purposes of determining appropriate injunctive remedy).

union affiliation is relevant in the minds of potential customers and telephone consultants who are an important source of business references, in no instance do we find credible proof, by a preponderance of the evidence,[29] to permit the Court to conclude, in fact or law, that any damages were proximately caused by defendant's illegal conduct as to the specific customer or job site, or that a consultant's or potential customer's preference for Local 3 labor, to the extent expressed, was motivated because of Local 3's prior misconduct.[30]

**29.** We are unpersuaded by plaintiff's evidence and primarily adopt the factual analysis set forth in defendant's post-trial brief at pages 53 to 63 and 107 to 124, except insofar as it raises issues as to admissibility. Specifically, our findings include:

*As to Curtis, Mallet-Prevost:* the testimony of plaintiff's salesman Murphy and documents he prepared were selective and self-serving, based in large part on hearsay admitted for limited purposes; plaintiff failed to negate that the customer's choice of a competing product was other than on its merits (Tr. 260, 264, 268, 273). The customer was not called as a witness.

*As to Fish & Neave:* plaintiff made no bid; the customer admittedly had a negative reference about GDCC's DBX (Tr. 869–73, D's Exh. K); the customer did not testify.

*As to Harper & Row:* the winning bidder was non-Local 3 affiliated; the absence of contemporary documents was not satisfactorily explained; witnesses were uncertain of material facts (Tr. 812–14).

*As to Hunter College:* plaintiff's failure to bid was primarily a function of job requirements other than union affiliation of technicians Tr. 867, 874–6; D. Exh. J); witnesses were uncertain of material facts and unaware of improper acts with respect to the job by Local 3 (Tr. 663–665).

*As to the New York Stock Exchange:* while plaintiff's bid did not win, the RFP provision requiring "all cost estimates" to be "based on use by contractor of Local 3 (IBEW) labor for complete installation" (P.Exh. 56) is not a limitation of bids to Local 3 contractors. Customer did not testify.

*As to Rockefeller Center, Inc.:* no union was named in RFP; it is unknown who obtained the bid, what was purchased or whether Local 3 contractor was utilized.

*As to Technical Publishing Co.:* plaintiff's bid was neither lowest nor second lowest; it was not established whether customer even ultimately purchased a new telephone system (Tr. 874–76).

*As to all sites:* compatible labor clauses may serve lawful purposes; plaintiff was urged by

## V.

### Legal Conclusions

There is no dispute concerning, and we find, that this Court has personal and subject matter jurisdiction.[31]

■ Plaintiff is an employer, and defendant is a labor organization, within the meaning of the National Labor Relations Act, as amended.[32] Local 3's conduct at One Broadway, involving Fox, Glynn & Melamed and GDCC, and its conduct at Two Broadway, involving Merrill Lynch and GDCC, violated § 8(b)(4) of the Act.[33]

its own manager to pay, but did not pay, commissions to telephone consultants which could have limited or precluded certain opportunities (Tr. 759–62).

**30.** Plaintiff's closing argument puts its ultimate contention in focus. Beyond recovery for damages unlawfully caused, plaintiff also argues that "this case really involves the question of whether or not the Communications Workers of America ... are going to have equal access to jobs ..." and that Section 303 should be used to supplement the remedial provisions of the NLRA where "the record demonstrates that this defendant refuses to pay heed to NLRB orders, refuses to pay heed to those NLRB orders when they are enforced by the Second Circuit." (Tr. 1033, 11.10–13). This argument, however appealing, does not justify an award of damages to plaintiff absent credible proof by a preponderance of the evidence that injury was proximately caused by violations of Section 8(b)(4). We reject the by-law provision, the history of prior sanctions on Local 3 and the absence of discipline of its members at the One and Two Broadway sites by Local 3 as, themselves or in combination, sufficient to establish the requisite evidence of causation under Section 303.

**31.** The Court's conclusions under prior headings, to the extent conclusions of law, shall be deemed incorporated in this Section V.

**32.** Local 3 is a labor organization under 29 U.S.C. §§ 152(5), 158(b), 160(i), 185 and 187. GDCC is an employer under §§ 2(6) and (7), 8(b)(4) and 303 of the Act. UTCC's substitution for GDCC as plaintiff does not preclude the application of collateral estoppel against Local 3 under the NLRB decision 204 NLRB No. 96 as to One Broadway. *Parklane Hosiery Co. Inc. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979).

**33.** An object of Local 3's actions was to force Morse Diesel, Henry Paul, and Fox Glynn & Melamed to cease doing business with GDCC. We find a similar object as to Local 3's actions as to GDCC's employment by Merrill Lynch.

Local 3 vigorously contended at trial that there is a total absence of any evidence showing that any officer, employee or representative of Local 3 incited, supported, encouraged or instigated any of the secondary work stoppages or jurisdictional disputes, thus preventing, under common law agency principles, any finding of Local 3 responsibility. It relied primarily on *Carbon Fuel Co. v. United Mine Workers*, 444 U.S. 212, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979) as dispositive on this issue. After trial on phase I, however, a Second Circuit decision involving Local 3 rejected the same arguments pressed here. See *NLRB and Northern Telecom, Inc. v. Local 3*, 730 F.2d 870 (2nd Cir.1984) ("Northern Telecom"). Even if not bound by the decision, we agree with its reasoning. Local 3's reliance on *Carbon Fuel*, therefore, is misplaced. See 730 F.2d at 876–7.

■ As in *Northern Telecom*, Local 3 again presses the argument that under common-law rules of agency, it should not be held liable for the acts of Forman diTusa or Steward Albanese and his co-workers, Mallandro and Squillante, arguing they acted individually and as employees of the site contractor, not agents of the Local. On the record here, we disagree.

First, as to the One Broadway site, we find the Local is collaterally estopped from denying liability.

Secondly, as to both sites, we conclude that *Northern Telecom* fully supports our findings that the Local, acting through its members, foreman diTusa (One Broadway) and Local 3 Shop Steward Albanese, Superintendent Mallandro and Foreman Squillante (Two Broadway), acted on behalf of the Local even if they also might have intended to benefit their employer, a fact we do not find. Moreover, and independently supporting our finding as to Two Broadway, we conclude that the activities of the Local 3 members there were undertaken with prior knowledge of Local 3's executive board, thus providing a direct link between officers of Local 3 and the conduct in question.

■ Taken at its logical limit, Local 3 would insist that, before responsibility for damages under Section 303 may be assessed against it, an officer or director of the Local must be shown by direct evidence to have specifically encouraged or directed the unlawful action producing the injury.

■ But Congress did not so limit Section 303. The prohibition against inducting or encouraging secondary boycotts is "broad enough to include ... every form of influence and persuasion." *Northern Telecom*, 730 F.2d at 876 (citations omitted) and nothing in the law prohibits findings based upon circumstantial evidence and the reasonable and natural inferences to be drawn from such evidence.

Indeed, as noted in another context,

"Strike encouragement sometimes is explicit but more often is cryptic. A union may employ subtle signals to convey the message to strike. One court noted that unions sometimes employ 'a nod or a wink or a code ... in place of the word "strike"'."

*Complete Auto Transit v. Reis*, 451 U.S. 401, 418 n. 1, 101 S.Ct. 1836, 1846 n. 1, 68 L.Ed.2d 248 (1981) (Powell, J., concurring in part).

Congress expressly recognized that, in suits by and against labor organizations, there would be problems in proof of a union member's authority to bind the union or in the union's ratification of a member's act sufficient to make the organization, rather than the individual responsible. Accordingly, it addressed the issue in 29 U.S.C. § 185(e) and provided that, "in determining whether any person is acting as an 'agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling." Rather, in looking at substance over form, the Court is guided, as the law demands, by resort to ordinary common law agency principles. See *Carbon Fuel v. UMWA*, 444 U.S. 212, 213, 100 S.Ct. 410, 412, 62 L.Ed.2d 394 (1979).

Here, applying common law agency principles [34] as to the Local's involvement at One Broadway, we have found that diTusa, a Local 3 member, and job foreman of Henry Paul, walked off the job to benefit Local 3 rather than his employer, in furtherance of Local 3's total job policy, a factor we may properly consider *Northern Telecom*, 730 F.2d at 876.

Moreover, at Two Broadway, Melandro, a Superintendent employed by New York Maintenance and Local 3 member periodically was summoned to, and conferred with, Local 3's executive board from March to September, 1981 about the allocation of work to plaintiff by Merrill Lynch. Throughout that period, he was both a participant in and aware of work stoppages and jurisdictional harrassments by Local 3 members, including Steward Albanese and foreman Squillante, of plaintiff's CWA workers.

Plaintiff additionally argues that liability is buttressed by Local 3's failure to discipline its members, which clearly it did not, and did not even try, to do. We do not find this persuasive in the context of the relatively short work stoppage at One Broadway. However, given the length of time, the frequency of confrontations by Local 3 members with plaintiff's employees, the repeated threats, express and implied, of personal violence, the acts of vandalism and the creation of health and safety risks at plaintiff's job site, Local 3's failure to take any action other than to transfer Albanese

in September, 1981 lends support for our conclusion that the Local, through its Executive Board, was supporting and encouraging, and authorized and ratified, the unfair labor practices and, therefore, is liable for damages under Section 303.[35]

## VI.

### Phase II Proceedings

In order to proceed with phase II of the trial, the parties are requested to review the pre-trial order in light of the disposition of the liability issues in this opinion. Within 20 days of the date of entry hereof, the parties should confer to determine what matters remain to be tried and what modifications, if any, should be made in the pretrial order. Within 30 days of the date of entry hereof, the parties shall jointly submit any proposed modifications. The Court will then determine, based on the estimate of time necessary to conclude the trial, what date should be set for hearing.

SO ORDERED.

### Annex A

In addition to the disposition of evidentiary issues set forth in this Court's opinion, the Court makes the following disposition of matters raised in the parties' post-trial briefs on evidentiary issues, keyed to the items listed by plaintiff in its post-trial evidentiary memorandum:

---

**34.** See A.L.I., Restatement of Agency 2d, §§ 26–7, 34, 39, 42–3, 82, 93, 94 (1958); Sell, Agency, §§ 34, 39–41, 61, 72, 108 (1975).

**35.** Local 3, pursuant to the IBEW constitution, and 29 U.S.C. § 411(a)(5), may not discipline its members except following the filing of written charges and conviction by a trial board after a trial which satisfies due process. Such charges may be brought, however, under Article XXVII, section 1(20) of the Constitution of the IBEW where a member "[c]auses a stoppage of work because of an alleged grievance or dispute without having the consent of the L[ocal] U[nion] or its proper officers." No such charges were filed, and none of Local 3's members were disciplined, for any conduct directly or indirectly related to the One Broadway and Two Broadway sites. In September, 1981, however, defendant's business representative, following the transfer of work from plaintiff to Local 3 members, replaced Albanese as the Local 3 Shop Steward. Despite the Local's argument that formal disciplinary proceedings are cumbersome, expensive and slow, there is no direct evidence explaining why such charges were not brought. Failure to discipline is equally consistent with inferences that the Local supported the conduct or believed it could not establish a charge because the acts were authorized or ratified. Moreover, such failure may contribute to a general understanding that rules may be violated with impunity and thus effectively condones their violation. See *Shimman v. Frank*, 625 F.2d 80, 97 (6th Cir.1980) (inaction gave rise to the conclusion that the Local's Business Manager "authorized" assault by District representative on dissident Union member).

1. The Standard GDCC Subcontract is admissible.
2. The testimony of Fox, Glynn & Melamed's partner, Johnson, is admissible. State of mind is relevant to the grounds of termination of the GDCC contract.
3. The evidence as to cable cutting at 120 Broadway is admissible. It was not, however, material to the Court's findings.
4. The papers in NLRB Case Nos. 2–CC–1734 and 2–CD–656 are admissible.
5. Exhibit 15 is admissible.
6. Exhibit 16 is admissible.
7. Exhibits 20 and 21 are admissible.
8. Exhibits 24, 42–44 are admissible.
9. The testimony as to the oral statements of Squillante and "Mullandro" is admissible.

The additional evidentiary issues raised by defendant, who objected to any testimony by witness Kinsella and other testimony admitted concerning plaintiff's claimed lost sales, are deemed moot in view of the Court's findings as to lack of causation.